[No. B169265. Second Dist., Div. Seven. Jan. 21, 2004.]

GARY K. WOLF et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WALT DISNEY PICTURES AND TELEVISION, Real Party in Interest.

**COUNSEL**

Rintala, Smoot, Jaenicke & Rees, J. Larson Jaenicke, Robert W. Hodges, Michael B. Garfinkel and Heather M. Noelte for Petitioners.

No appearance for Respondent.

Sheppard, Mullin, Richter & Hampton, Martin D. Katz, Lisa N. Stutz and Ann B. Clark for Real Party in Interest.

## OPINION

**JOHNSON, J.**—An author seeks a writ of mandate to compel the trial court to vacate its order granting summary adjudication of issues in favor of an entertainment industry conglomerate on its cross-claims for a declaration it was not required to pay royalties on the value of promotional agreements with third parties for which it received no cash. At issue is whether the term "gross receipts" as used in the royalty agreement is reasonably susceptible to an interpretation urged by the author to mean other valuable in-kind consideration as well as cash. The trial court found the term "gross receipts" clearly and unambiguously meant "cash" only, and rejected expert extrinsic evidence indicating the term in the entertainment context meant money as well as the value of other consideration received. We conclude the trial court erred in concluding the term "gross receipts" was not reasonably susceptible to the interpretation urged by the author. Accordingly, we grant the petition for writ of mandate with directions for the trial court to vacate its order granting summary adjudication and remand for further proceedings.

### FACTS AND PROCEEDINGS BELOW

Gary K. Wolf and his company Cry Wolf!, Inc. (Wolf), are the petitioners in this case. Petitioner, Gary K. Wolf, is the author of an original novel entitled Who Censored Roger Rabbit? In his novel Wolf created characters such as Roger Rabbit, Jessica Rabbit, Baby Herman and Detective Eddie Valiant. Wolf's novel also created and introduced the concept of Toontown as the place where these cartoon characters lived.

Shortly after the book's release in 1981, real party in interest, Walt Disney Pictures and Television (Disney), reached an agreement with Wolf to option nearly all rights to Who Censored Roger Rabbit? Disney memorialized the terms of the parties' oral agreement in a letter dated May 1981. According to this deal memo, if Disney exercised its option, Wolf would be entitled to a 5 percent royalty on children's story books, children's story-telling records and on merchandise based on the characters he had developed in Who Censored Roger Rabbit? as well as other rights.

In 1983, Disney exercised its option to purchase the rights to Who Censored Roger Rabbit? The parties thereafter executed a "long form" purchase agreement. This 1983 agreement superceded the 1981 deal memo and expanded on the parties' respective rights regarding motion picture rights, television series rights, and other matters. In the 1983 agreement, Wolf also assigned to Disney the right to exploit the characters he created in his novel.

Not one of the parties who played a role in, or who helped negotiate the terms of, the 1983 agreement could recall any discussion they held at the time

regarding the meaning of the term "gross receipts" as used in paragraph 21 governing royalty rights to character merchandise.

Thereafter, Disney developed and coproduced the motion picture Who Framed Roger Rabbit? with Steven Spielberg's Amblin Entertainment. Disney released the movie in June 1988. It proved to be an extraordinarily successful feature combining cartoon and live action actors.

By 1989 a dispute arose among the parties regarding use of Wolf characters at theme parks and in movie cels, auditing rights, and other matters. The parties resolved their dispute by entering into another agreement in 1989 which clarified and/or modified certain terms of the 1983 agreement. However, Wolf's right to a 5 percent royalty on merchandise depicting his characters remained intact. Again, none of the negotiating parties to the 1989 agreement could recall any discussion regarding the meaning of Wolf's right to a royalty on "gross receipts" from character merchandise.

In order to promote the theatrical and home video releases of the film (and at various times thereafter to promote and sustain the Roger Rabbit franchise), Disney entered into alliance agreements with corporate entities such as Kodak, Coca-Cola, and Burger King, licensing them to use Roger Rabbit and Disney characters in their advertising and promotions. The terms of Disney's promotional agreements with these third parties varied: sometimes Disney received money from the other company; sometimes Disney paid the other company, and in still other situations, no cash exchanged hands. An example of this latter type of agreement is a Disney/McDonald's agreement entered into in 1988 in connection with the picture's release. In this agreement Disney allowed McDonald's to use Wolf as well as Disney characters in a "tie-in" promotion between its menu items and the motion picture Who Framed Roger Rabbit? Under this agreement McDonald's agreed to: (1) conduct a promotion featuring the licensed characters on 18 million collector cups; (2) purchase $12 million worth of specified advertising themed to the motion picture; and (3) place approximately $100 worth of point-of-purchase materials at each of the McDonald's stores throughout the United States. Disney received no cash directly from McDonald's under this particular licensing agreement.

In 1991, Disney entered into another so-called alliance agreement with Eckerd/Kodak. The agreement called for Eckerd Drug Company to fund and produce television and radios ads, print ads, in-store advertisements and to undertake other promotional efforts. The agreement required Kodak to underwrite the cost of producing hundreds of thousands of Walt Disney World collector pins depicting Disney as well as Roger Rabbit characters. In exchange, Disney provided six grand prize travel packages to Walt Disney World. Disney received no cash directly from this arrangement.

On the other hand, Disney did receive cash under its 1995 licensing agreement with McDonald's to promote Disneyland's 40th anniversary. McDonald's Disneyland 40th Anniversary Happy Meal agreement was a licensing arrangement which allowed McDonald's to give away eight toy car "premiums" featuring various Disney characters, including one car which featured two of the Roger Rabbit characters. McDonald's paid Disney $400,000 under the licensing agreement for the eight cars. Because the Wolf characters represented one eighth of this amount, Disney reported $50,000 attributable to the Roger Rabbit characters and paid Wolf 5 percent of this amount, or $2,500.

Wolf claimed he was entitled to a 5 percent royalty every time Disney licensed Roger Rabbit characters for use in any merchandising venture by Disney or through its alliance agreements. He asserted he was entitled to this royalty based on the value of the licensing agreement to Disney from use of the Roger Rabbit characters, whether or not Disney chose to receive the benefit in cash. Disney countered it was not obligated to pay Wolf any royalty unless or until it received actual cash from a licensing agreement.

Unable to resolve the dispute, Wolf filed suit against Disney in May 2001. In March 2002, Disney filed a cross-complaint for declaratory relief, reformation, money had and received and unjust enrichment. In October 2002, Disney moved for summary adjudication on three of the causes of action in its cross-complaint which sought a declaration the parties' 1983 contract only obligated it to pay a 5 percent royalty on cash it received for character merchandising, and that it had no obligation to pay a royalty on any noncash consideration it received from licensing Wolf's characters for use in merchandise for promotional purposes.[1]

In its motion Disney argued it was entitled to summary adjudication of issues because the "clear and unambiguous meaning" of "gross receipts" in the contract could only mean receipt of cash money. Disney claimed the contract language was clear and unambiguous because the contract did not obligate it to account for royalties to Wolf unless and until it had *received* funds in the United States. In opposition, Wolf presented extrinsic evidence in the form of expert testimony to refute Disney's assertion. According to

---

[1] Specifically, the motion for summary adjudication of issues sought declarations: (1) Disney had no obligation to pay Wolf anything in connection with the 1991 Eckerd/Kodak promotional agreement because neither Disney nor its subsidiaries received cash under this particular agreement; (2) Disney had already satisfied its contractual obligation to pay Wolf what it owed in connection with the McDonald's Disneyland 40th Anniversary Happy Meal agreement; and (3) Disney had no obligation to pay Wolf anything in connection with any third party agreement if Disney or its subsidiaries received, or will receive, no cash from the third party, because the parties' 1983 agreement specifies its obligation to pay royalties does not accrue unless or until monies are received by Disney or its subsidiaries.

Wolf's expert, the term "gross receipts" in the entertainment industry means "money or the value of other consideration received by the studio," when not otherwise defined or limited by written agreement.

The trial court heard several hours of arguments on the motion over two court days. The trial court questioned Wolf regarding his proffered extrinsic evidence that the term "gross receipts" was interpreted in the entertainment industry to mean cash or other valuable consideration.[2] The court acknowledged Wolf's expert's testimony created an ambiguity regarding the meaning of the term "gross receipts." However, the court was persuaded the contract term clearly and unambiguously meant Disney's obligation to pay Wolf royalties only arose with actual receipt of cash in connection with the merchandising of Wolf's characters. The trial court found the term "gross receipts" was not reasonably susceptible to the meaning urged by Wolf and rejected his proffered extrinsic evidence.

In its written order the trial court ruled Disney had met its burden of showing there were no triable issues of material fact and Wolf had failed to raise a triable issue of material fact. The court thus granted summary adjudication in favor of Disney on its first, fourth and seventh causes of action in its cross-complaint. The court reasoned: "Wolfe [*sic*] claims entitlement to 5% of the 'promotional value' of the two Alliance Agreements at issue, that is, monies *not actually received* by Disney. However, the plain and unambiguous language of [] Wolfe's [*sic*] contract provides that he is entitled to 5% of the monies *received* by Disney. The contract at issue was negotiated at arms length between the parties. The contract is clear and unambiguous and extrinsic evidence is not received to interpret the contract. The contract does not require the addition of fictional receipts, nor does it require payment to Wolfe [*sic*] of 5% of monies that were never received by Disney.

"Cross-Complainants' motion for summary adjudication of issues on the first, fourth, and seventh causes of action of Disney's cross-complaint against Wolfe [*sic*], filed on March 11, 2002, is granted. Pursuant to [] paragraph 21 of the 1983 agreement, with regard to the July 18, 1991 Kodak agreement and the March 21, 1995 McDonald's agreement, Disney has no obligation to pay Wolfe [*sic*] 5% of the gross receipts, until monies have been received by Disney. Although the court has read all papers filed in support of and opposition to the instant motion, extrinsic evidence is not admitted for the reasons stated. Only admissible nonextrinsic evidence has been considered in deciding this motion."[3]

---

[2] The trial court read, and thus to this extent, "considered" Wolf's proffered extrinsic evidence.

[3] Italics in original.

Wolf filed a petition for writ of mandate to compel the trial court to vacate its order for summary adjudication. We issued an order directing the trial court to either vacate its order for summary adjudication and make a new and different order denying the motion for summary adjudication, or in the alternative, to show cause why the requested relief should not be granted. Respondent Superior Court did not respond and we now consider the petition.

## DISCUSSION

### I. *STANDARD OF REVIEW.*

■ On review of an order summarily adjudicating issues, we review the record de novo to determine whether the prevailing party has conclusively negated necessary elements of his opponent's case or demonstrated under no hypothesis is there a material issue of fact which requires the process of a trial.[4]

### II. *THE TERM "GROSS RECEIPTS" IN PARAGRAPH 21 OF THE 1983 AGREEMENT CAN BE REASONABLY INTERPRETED TO MEAN CASH AS WELL AS VALUABLE IN-KIND CONSIDERATION.*

The dispute in this case is over the meaning of the term "gross receipts" for purposes of triggering Disney's obligation to pay Wolf royalties on character merchandising. Wolf contends "gross receipts" as used in the royalty agreement means "cash and other valuable consideration." Disney contends the agreement clearly and unambiguously provides its obligation to pay Wolf royalties from the exploitation of certain merchandising rights arises only upon receipt of monies. The trial court ruled the term "gross receipts" was not ambiguous—it meant only cash actually received by Disney. The court further found the term was not reasonably susceptible to the meaning Wolf urged claiming the term as used in this context included not just cash, but also other valuable consideration such as promotions undertaken by third parties employing his characters. We disagree with the trial court.

■ "Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641]; *Pacific Gas & Electric*

---

[4] See *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673–674 [25 Cal.Rptr.2d 137, 863 P.2d 207].

*Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1140–1141 [234 Cal.Rptr. 630].) Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 40 & fn. 8; *Pacific Gas & Electric Co. v. Zuckerman, supra,* 189 Cal.App.3d at pp. 1140–1141.)"[5]

■  The interpretation of a contract involves "a two-step process: 'First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]' (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal. Rptr. 2d 554].) The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. (*Ibid.*) The trial court's resolution of an ambiguity is also a question of law if no parol evidence is admitted or if the parol evidence is not in conflict. However, where the parol evidence is in conflict, the trial court's resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence. (*Id.* at p. 1166.) Furthermore, '[w]hen two equally plausible interpretations of the language of a contract may be made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory.' (*Walter E. Heller Western, Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158 [241 Cal.Rptr. 677].)"[6]

The term "gross receipts" appears several times in the parties' agreement. In the exhibit attached to the contract discussing motion picture rights, the term appears in a separate section heading and is given a specific definition peculiar to motion picture revenue and exclusions. "Gross receipts" also appears as a separate section heading in the exhibit discussing television series rights. Again, the term is defined and given a peculiar meaning tied to revenue sources and exclusions uniquely relevant to production of a potential

---

[5] *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].

[6] *WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1710 [50 Cal.Rptr.2d 323]; see also *Morey v. Vannucci, supra,* 64 Cal.App.4th 904, 913 ["An appellate court is *not* bound by a trial court's construction of a contract where (a) the trial court's contractual interpretation is based solely upon the terms of the written instrument *without* the aid of extrinsic evidence; . . ."].

television series. In the section of the contract discussing Wolf's royalty rights to *character merchandising* the term "gross receipts" again appears. This time, however, the term does not appear in a separate section heading, and "gross receipts" is not defined. Moreover, the term is not even capitalized to suggest it has a special or limited meaning in the merchandising context. As a result, the term "gross receipts" must be considered in light of all the circumstances and the overall context of the contract.

Paragraph 2 of the agreement describes the merchandising rights Disney purchased:"(h) The sole and exclusive right to make, publish and vend, throughout the world, or to license others so to make, publish and vend, representations of the characters created by the Seller [Wolf] which are in the work (including said characters from the work appearing in any such motion pictures or other adaptations), upon, in and/or in connection with articles of merchandise, or the advertising, display or exploitation of merchandise or in connection with any commercial activities."[7]

Paragraph 21 of the 1983 agreement concerns Disney's obligation to pay royalties for the merchandising of Wolf's characters. This paragraph provides:"21. In the event that Purchaser [Disney] exercises any of the rights granted to it in and by Subparagraph 2(h), (i) and (k) hereof, Purchaser agrees to pay to Seller [Wolf] a sum equal to five percent (5%) of Purchaser's *gross receipts* derived from the exercise of such rights, which, in the event of Purchaser's licensing of any such rights to others, shall be composed of Purchaser's royalties so derived from the licensee. In the event that such licensee is a subsidiary of Purchaser, then such royalties received by Purchaser from such subsidiary shall be deemed to be not less than five percent (5%) of such subsidiary's gross receipts derived from the exercise of such rights. Purchaser's obligation to pay such sums to Seller shall not accrue unless and until monies with respect to which the same are to be paid shall have been received within the United States of America by, and placed at the unrestricted disposal of, Purchaser or Purchaser's subsidiary (or if restricted from being transmitted to the United States by applicable law or regulations ['restricted funds'] then the restricted funds shall be deemed to have been so received to the extent used by Purchaser or Purchaser's subsidiary in such territory from which such monies would have otherwise been transmitted). So long as such monies are so received, Purchaser shall render semi-annual statements to the Seller within forty-five (45) days after the end of each half

---

[7] Disney also purchased the right to use Wolf's characters in children's storytelling recordings, and in various types of children's books.

of the calendar year, showing the sums of money so received during the preceding half with respect to which the said obligation applies; and said statements shall be accompanied by payment of the amount appearing thereby to be then due from Purchaser to Seller. All such statements shall be mailed to Seller at the address specified for notices herein, unless or until Purchaser is otherwise instructed in writing. All statements and accountings furnished by Purchaser hereunder shall be conclusively deemed correct unless the same shall be objected to within ninety (90) days from Purchaser's rendition thereof. . . ." [8]

Disney emphasizes this paragraph uses the terms "monies" and "monies so received" and discusses "statements" for monies "so received." Based on this language in the paragraph on royalty rights Disney argues "gross receipts" clearly and unambiguously means only cash, and then only when actual cash is received.

In support of its argument "gross receipts" can only mean "cash received," Disney relies on the decision in *County of Sacramento v. Pacific Gas & Elec. Co.*[9] There the court held the utility's gross receipts for purposes of calculating its franchise fee did not include the value of electricity consumed by the utility itself in generating electricity for sale to consumers. The decision in *County of Sacramento* is of no assistance here. In the context of franchise fees on public utilities, the definition of the term "gross receipts" was dictated by statute and prior decisions interpreting the statute at issue, which excluded the monetary value of electricity consumed internally and not sold for cash. Accordingly, the decision in *County of Sacramento* sheds no light on the issue whether the term "gross receipts" may

---

[8] Italics added. The balance of paragraph 21 provides: "Purchaser's said obligation shall not apply to picture books or other books containing no text material (or containing text material averaging not more than two lines per page), comic strips, comic books, magazines or other similar types of publications, nor to or in connection with publication of, or sound recordings or record albums of, only music or lyrics, or both (as distinguished from children's storytelling records under Subparagraph 2(i)), from any of the Purchaser's versions of the work. Nothing in this paragraph contained shall be construed as requiring Purchaser to manufacture, publish or sell, or to license the manufacture, publication or sale of, any items which are the subject hereof. In the case of restricted funds, at the request and expense of Seller, and subject to applicable law and banking regulations, Purchaser agrees to cause an amount equal to the sum otherwise payable to Seller hereunder with respect to such restricted funds, to be deposited in a bank account in the territory involved in Seller's name, and such deposit shall constitute payment by Purchaser to Seller hereunder. If, other factors being equal, Purchaser has a choice between an interest and noninterest bearing bank account at the same bank, the deposit will be made in the bank account which is interest bearing. Purchaser shall in no event be liable for interest on sums deposited regardless of whether such deposit is made in an interest or non-interest bearing account."

[9] *County of Sacramento v. Pacific Gas & Elec. Co.* (1987) 193 Cal.App.3d 300 [238 Cal.Rptr. 305].

be subject to multiple meanings in a private contract in the entertainment industry context.

Wolf offered extrinsic evidence to show the term "gross receipts" meant not just cash receipts but also other valuable consideration received. Wolf pointed out the interpretation he urged was consistent with the legal definition of "gross receipts" as defined in Black's Law Dictionary, namely, "[t]he total amount of money or the value of other consideration received from selling property or from performing services."[10] Wolf also referred the court to an appellate decision in which the court stated the term "gross receipts" was such a familiar and commonplace term in accounting and taxation that when used in its ordinary sense it meant the "total amount of money or the value of other consideration received."[11]

Wolf argued this is the definition of "gross receipts" customarily used in the entertainment industry when the term is not otherwise limited or defined by written contract. Wolf thus urged the court to read paragraph 21 in the context of custom and practice in the entertainment industry. The extrinsic evidence Wolf offered to explain industry custom consisted of expert testimony from David Held. Mr. Held is an attorney who has worked in the motion picture industry since 1973. United Artists Corporation, Paramount Pictures Corporation and the Samuel Goldwyn Company have employed him. He initially worked as an attorney in the legal department then in such capacities as Director of Business Affairs, Vice President of Business Affairs and was ultimately promoted to the position of Executive Vice President in Charge of Business Affairs in Paramount's Motion Picture Group. Since 1988, Held has been employed as a consultant in the entertainment industry. In his 28 years of experience Held had personally negotiated, or supervised negotiations of, thousands of agreements and also reviewed thousands of proposals involving third party participation agreements, film performance reports, and the like.

Held stated, from the start of his career until the present, the term "gross receipts" in the entertainment industry "means the total amount of money or the value of other consideration received by the studio" when not otherwise specifically defined to limit the term's meaning.

---

[10] Black's Law Dictionary (6th ed. 1990) page 703, 2d column.

[11] See *County of Sacramento v. Pacific Gas & Elec. Co., supra,* 193 Cal.App.3d 300, 309 ("the courts have always considered that gross receipts are measured by money or other consideration actually received by a party or paid for his benefit").

In his declaration, Held explained the portion of paragraph 21 which uses the terms "monies" does not purport to define the term "gross receipts." Instead, it specifies Disney's obligation to pay royalties does not arise unless or until potential or proposed licensing of the Wolf characters became a fait accompli and the terms of such agreements carried out so as to ensure the studio did not become responsible to pay royalties on failed or aborted projects. Regarding alliance agreements in which the licensor received promotional benefits rather than cash, Held stated industry custom for purposes of paying royalties was to attribute a cash value to the benefits a studio received.

The trial court read Held's declaration and questioned Wolf about its meaning. The court noted, "So where we are here is that personally I think 'gross receipts,' as the parties wrote it in paragraph 21, means 'money.' But if I have to consider that Held declaration, you win the summary judgment. There's a disputed issue of fact. That's where we are. That's the bottom line." Ultimately, the trial court concluded it did not need to consider Wolf's extrinsic evidence, finding the term "gross receipts" unambiguously meant cash money.

We find the trial court erred in its treatment of the proffered extrinsic evidence on the issue whether the contract was ambiguous. At the very least, this conflicting evidence exposed an ambiguity in the term's meaning. If Held's definition is the industry norm, then the competing definitions were equally plausible. Disney, on the other hand, argues the parties' contract did not use the term "gross receipts" in a technical sense and for this reason the expert's declaration of industry custom and practice was inadmissible. However, we note, Disney did not—and does not attempt to—refute the expert's factual assertion through independent evidence that in the entertainment industry context "gross receipts" means not only cash, but also the value of other consideration received. Accordingly, the trial court was not justified in rejecting this extrinsic evidence on the ground it did not comport with the court's own view of the contract language as unambiguous.

This case is analogous to the situation presented in *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Company*.[12] In *Thomas Drayage*, the Supreme Court considered a contract clause in which the defendant agreed to indemnify the plaintiff for injury to property arising out of or connected with the performance of the contract. The trial court agreed with the defendant the clause could be read to cover only injury to the property of third parties. The trial court nevertheless held the "plain language" of the agreement also required defendant to indemnify plaintiff for

---

[12] *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641]

injuries to plaintiff's property. Once the trial court concluded the contract had a plain meaning it refused to admit any extrinsic evidence contradicting its interpretation.[13] The Supreme Court observed, "[w]hen the court interprets a contract on this basis, it determines the meaning of the instrument in accordance with the '. . . extrinsic evidence of the judge's own linguistic education and experience.' [Citation.] The exclusion of testimony that might contradict the linguistic background of the judge reflects a judicial belief in the possibility of perfect verbal expression . . . ."[14]

The court explained the test for admitting extrinsic evidence as an aid in interpreting contract terms as follows: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.]"[15]

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties."[16] "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. (Civ. Code, §§ 1635–1656; Code Civ. Proc., §§ 1859–1861, 1864; *Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814 [34

---

[13] *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., supra,* 69 Cal.2d 33, 36.

[14] *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., supra,* 69 Cal.2d 33, 36–37; see also *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232 [88 Cal.Rptr.2d 777] [court erroneously refused to even consider extrinsic evidence of trade usage and custom in evaluating the fair market value of pipeline easements].

[15] *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., supra,* 69 Cal.2d 33, 37. The Supreme Court provided examples of how extrinsic evidence of trade usage or custom revealed latent ambiguities in the meaning of terms otherwise unambiguous on their face. Such evidence had been admitted to show the word "ton" in a lease meant a long ton or 2,240 pounds and not the statutory ton of 2,000 pounds; the word "stubble" in a lease included not only stumps left in the ground but everything left on the ground after the harvest; the term "north" in a contract dividing mining claims indicated a boundary line running along the magnetic and not the true meridian; and a form contract for purchase and sale was actually an agency contract. (*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., supra,* 69 Cal.2d 33, 39, fn. 6 and cases cited.)

[16] *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].

Cal.Rptr.2d 732]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 688–689, pp. 621–623.)" [17]

Because there is no evidence in this case of objective manifestations of the parties' intent,[18] and because the term at issue is undefined in the parties' contract, the only way to construe the meaning of the term "gross receipts" is to consider the nature of the contract and the circumstances under which the parties negotiated.[19] In this case, both the nature of the contract and the circumstances involved the motion picture industry. The offered evidence of industry custom and usage revealed the term "gross receipts" had more than one possible meaning. Thus, the industry expert's statements of fact were relevant and admissible to expose the latent ambiguity in the contract language regarding the industry's customary usage of the term. Held's declaration did not violate the parol evidence rule, as Disney suggests.[20] On the contrary, the proffered evidence regarding trade usage and custom was relevant to prove an interpretation to which the agreements were reasonably susceptible in the entertainment industry context.

The Supreme Court discussed the rule regarding the admission of trade usage and custom in *Ermolieff v. R.K.O. Radio Pictures, Inc.*[21] In *Ermolieff* the parties were producers and distributors in the motion picture industry. The plaintiff had reserved distribution rights in all countries not listed in an exhibit attached to the contract. The exhibit listed the United Kingdom as an area for which plaintiff had assigned his distribution rights. A dispute arose

---

[17] *Morey v. Vannucci, supra,* 64 Cal.App.4th 904, 912.

[18] This is distinct from evidence of the uncommunicated *subjective* intent of two of Disney's employees who acknowledged never discussing the term with Wolf or his representatives, but who testified they understood the term "gross receipts" to mean cash received. These employees could only assume Wolf and his representatives had the same meaning in mind. Based on these Disney employees' testimony, Disney invokes the rule that when a term is found to be ambiguous, "it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, § 1649; *Bank of the West v. Superior Court, supra,* 2 Cal.4th 1254, 1264–1265.) This rule does not, as Disney suggests, mean the promisor's subjective intent controls. The rule is instead designed to override the promisor's subjective intent whenever necessary to protect the promisee's objectively reasonable expectations. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th 1254, 1265.) As we later note, Wolf's objectively reasonable expectations at the time of negotiations remains a material triable issue of fact.

[19] See, e.g., *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 442 [15 Cal.Rptr.2d 622].

[20] Compare *Bionghi v. Metropolitan Water Dist. of So. California* (1999) 70 Cal.App.4th 1358 [83 Cal.Rptr.2d 388] [integrated agreement which gave the district the right to cancel the contract on 30 days' written notice could not be contradicted by the plaintiff's proposed additional condition of cancellation only with good cause]; *General Motors Corp. v. Superior Court, supra,* 12 Cal.App.4th 435 [current counsel who had not negotiated settlement and release agreement could not offer competent testimony regarding the contracting parties' subjective intent when executing the agreement].

[21] *Ermolieff v. R.K.O. Radio Pictures, Inc.* (1942) 19 Cal.2d 543 [122 P.2d 3].

over the question whether Ireland, or the "Free Irish State," was included within the global term "United Kingdom." The plaintiff argued the plain language of the contract made clear Ireland was excluded because it was not a part of the United Kingdom. The studio countered including Ireland within the term "United Kingdom" was the custom and practice in the motion picture industry and such usage was part of the contract.[22] Both parties sought declaratory relief.

At the close of the plaintiff's case the trial court ruled the evidence of trade usage incompetent, struck the defendant's evidence, and entered judgment in favor of the plaintiff.[23] The Supreme Court reversed. "The correct rule with reference to the admissibility of evidence as to trade usage under the circumstances here presented is that while words in a contract are ordinarily to be construed according to their plain, ordinary, popular or legal meaning, as the case may be, yet if in reference to the subject matter of the contract, particular expressions have by trade usage acquired a different meaning, and both parties are engaged in that trade, the parties to the contract are deemed to have used them according to their different and peculiar sense as shown by such trade usage. Parol evidence is admissible to establish the trade usage, and that is true even though the words are in their ordinary or legal meaning entirely unambiguous, inasmuch as by reason of the usage the words are used by the parties in a different sense. [Citations.] The basis of this rule is that to accomplish a purpose of paramount importance in interpretation of documents, namely, to ascertain the true intent of the parties, it may well be said that the usage evidence does not alter the contract of the parties, but on the contrary gives the effect to the words there used as intended by the parties. The usage becomes a part of the contract in aid of its correct interpretation."[24]

In *Ermolieff* the trial court at least considered the proffered extrinsic evidence throughout the plaintiff's entire case-in-chief. In the present case, by contrast, the trial court rejected the evidence after reading the expert's declaration and questioning Wolf on its content. Yet, this extrinsic evidence of trade usage exposed a latent ambiguity in the contract language and presented an alterative interpretation to which the term "gross receipts" was reasonably susceptible in the circumstances. Accordingly, we conclude the trial court erred in rejecting the extrinsic evidence and in concluding the term "gross receipts" was not reasonably susceptible to the interpretation urged by Wolf that according to industry custom and usage "gross receipts" meant cash and other valuable consideration received.

---

[22] *Ermolieff v. R.K.O. Radio Pictures, Inc., supra,* 19 Cal.2d 543, 545–546.

[23] *Ermolieff v. R.K.O. Radio Pictures, Inc., supra,* 19 Cal.2d 543, 546.

[24] *Ermolieff v. R.K.O. Radio Pictures, Inc., supra,* 19 Cal.2d 543, 550.

## III. *THE CONFLICTING INTERPRETATIONS OF THE CONTRACT TERM RAISE FACTUAL ISSUES WHICH PRECLUDE A DETERMINATION AS A MATTER OF LAW.*

Having determined the contract is reasonably susceptible to the meaning given it by Wolf, we address the second step in the analysis—the ultimate construction to be placed on the ambiguous language. As noted, where no extrinsic evidence is introduced or the evidence is not in conflict, an appellate court will independently construe the contract.[25] "Where, however, a conflict in the evidence exists, it must be resolved in the trial court, as with any question of fact, before the court can declare the meaning of the contract as a matter of law."[26]

From what this court has observed earlier, it is apparent triable issues of fact remain regarding the proper meaning to be given the term "gross receipts," thus precluding our independent interpretation of the contract as a matter of law. By way of example only, Disney claims it receives nothing from the noncash alliance agreements. In the alternative, Disney argues even if it derives some intrinsic benefit from participating in joint promotions, it is not feasible for third parties to ascribe values to these promotional activities unless Disney receives cash. Disney thus claims under Wolf's interpretation it would be impossible to comply with its contract obligation to provide an accounting for fictional benefits allegedly derived from noncash alliance agreements.

Wolf, by contrast, asserts Disney and its vast enterprises receive benefits from the third party promotions in the form of good will, increased theme part attendance, increased merchandise sales, film attendance and the like, most of these benefits not reflected in increased royalty payments to Wolf. For these reasons, Wolf claims attribution of monetary values for in-kind promotional activities is a routine matter in the entertainment industry.

The reasonableness of the competing interpretations thus must be tested in light of these concerns.

Also as noted, neither side presented any direct or objective evidence regarding the negotiating parties' understanding of the term "gross receipts"

---

[25] *Parsons v. Bristol Development Co., supra,* 62 Cal.2d 861, 866.

[26] *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 852 [44 Cal.Rptr.2d 227]; see also *Walter E. Heller Western, Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158 [241 Cal.Rptr. 677] ("[w]hen two equally plausible interpretations of the language of a contract may be made . . . parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory").

at the time the parties entered into the contract. Accordingly, Wolf's and Disney's objectively reasonable expectations regarding the scope of the term when they agreed to the contract remain additional triable issues of material fact.

## DISPOSITION

Let a peremptory writ issue directing the trial court to vacate its order granting the motion for summary adjudication of the cross-complainant's first, fourth and seventh causes of action for declaratory relief and to enter a new and different order denying said motion. Petitioners are entitled to costs in this proceeding.

Perluss, P. J., and Woods, J., concurred.

A petition for a rehearing was denied February 19, 2004, and the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied April 14, 2004. George, C. J., and Brown, J., did not participate therein.