[No. B184523. Second Dist., Div. Seven. Jan. 8, 2007.]

ROBERT WAGNER, Individually and as Trustee, etc., Plaintiff and Appellant, v.
COLUMBIA PICTURES INDUSTRIES, INC., Defendant and Respondent.

## COUNSEL

Alschuler Grossman Stein & Kahan, Samuel R. Pryor, Sally S. Liu and Matthew R. Belloni for Plaintiff and Appellant.

Sheppard Mullin Richter & Hampton, Martin D. Katz, Lisa N. Stutz and Jean-Paul Jassy for Defendant and Respondent.

## OPINION

**JOHNSON, Acting P. J.**—Robert Wagner individually and as trustee of his children's trusts brought this action against Columbia Pictures Industries, Inc., claiming he and the trusts are contractually entitled to share in the net profits Columbia earned from two motion pictures it produced based on the *Charlie's Angels* television series. The trial court concluded the contract did not entitle Wagner and the trusts to share in the profits from the movies and granted Columbia's motion for summary judgment. Wagner filed a timely appeal from the judgment. We affirm.[1]

## FACTS AND PROCEEDINGS BELOW

Robert Wagner and Natalie Wood (the Wagners) entered into an agreement with Spelling-Goldberg Productions (SGP) "relating to Charlie's Angels (herein called the 'series')." The contract entitled the Wagners to 50 percent of the net profits SGP received as consideration "for the right to exhibit photoplays of the series and from the exploitation of all ancillary, music and subsidiary rights in connection therewith." SGP subsequently sold its rights and obligations with respect to the *Charlie's Angels* series to defendant Columbia Pictures. Thirteen years later Columbia contracted to obtain the motion picture rights to the series from the heirs of the show's writers, Ivan Goff and Ben Roberts. In 2000 and 2003 Columbia produced and distributed two Charlie's Angels films based on the TV series.

Wagner contends the "subsidiary rights" provision in the agreement with SGP entitles him and the trusts to 50 percent of the net profits from the two Charlie's Angels films. Columbia contends even if the term "subsidiary rights" may sometimes include movie rights, its production of the Charlie's Angels movies did not constitute exploitation of a subsidiary right *"in connection with"* the "right to exhibit photoplays of the series."

Wagner brought this action against Columbia for breach of contract, unjust enrichment, declaratory relief and an accounting. Columbia answered and moved for summary adjudication of the cause of action for breach of contract. After the trial court granted that motion the parties stipulated to entry of judgment in favor of Columbia on the ground the order granting the motion as to the breach of contract cause of action effectively disposed of the remaining causes of action.

---

[1] This unusually complex case was well briefed and ably argued by counsel for both parties. Beyond the normal round of briefs and oral argument, counsel responded to two requests for letter briefs from the court and returned for a second oral argument. If we have erred in our resolution of the issues it was not for counsel's lack of effort to set us straight.

## DISCUSSION

### I.  SCOPE OF REVIEW.

In *Wolf v. Superior Court* we thoroughly examined the role of an appellate court called upon to review a trial court's decision interpreting a contract and we need not repeat this discussion here.[2] Essentially, when a party to a contract claims its terms are ambiguous the trial court's threshold determination of ambiguity is a question of law subject to our independent review. If parol evidence is admitted to determine the meaning of a contract term and the evidence is in conflict we defer to the trial court's determination under the substantial evidence test. If the evidence is not in conflict but is subject to different interpretations then we do not defer to the trial court's findings. Instead we review the lower court's interpretation de novo.[3]

### II.  THE CHARLIE'S ANGELS AGREEMENT IS UNAMBIGUOUS IN DESCRIBING THE CONDITIONS UNDER WHICH THE WAGNERS ARE ENTITLED TO SHARE IN THE NET PROFITS FROM THE MOTION PICTURES.

The Wagners' contract with SGP entitled them to a share of "all monies actually received by the producer, as consideration for the right to exhibit photoplays of the [Charlie's Angels] series, and from the exploitation of all ancillary, music and subsidiary rights in connection therewith." The principal dispute between the parties is whether the phrase "in connection therewith" modifies "Charlie's Angels television series," so the net profits SGP, or Columbia, received from any ancillary or subsidiary right which bears a "connection" to the television series are included within the agreement (Wagner) or whether the phrase "in connection therewith" modifies "the right to exhibit photoplays of the series" so only the net profits SGP, or Columbia, received by taking advantage of SGP's rights, as producer, to exhibit photoplays of the series are included in the agreement (Columbia).

■ Wagner offered extrinsic evidence to show the contract was reasonably susceptible to his interpretation. As has been explained in numerous cases, when a party contends the language of a contract is ambiguous the test for the admissibility of extrinsic evidence to explain the meaning of the contract is not whether the contract appears to the court to need interpreting "but whether the offered evidence is relevant to prove a meaning to which the

---

[2] *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350–1351, 1356–1357 [8 Cal.Rptr.3d 649].

[3] *Wolf v. Superior Court, supra,* 114 Cal.App.4th at pages 1350–1351.

language of the instrument is reasonably susceptible."[4] Therefore, the court must provisionally receive all credible evidence concerning the parties' intentions to determine whether the contract language is reasonably susceptible to the interpretation urged by a party. If in light of the extrinsic evidence the language is reasonably susceptible to the interpretation urged, then the extrinsic evidence is admitted to aid in interpreting the contract.[5] "If it is not, the case is over."[6]

### A. *Wagner's Extrinsic Evidence.*

#### 1. *The antecedent* Love Song *agreement.*

Wagner introduced evidence of the history of the negotiations underlying the Charlie's Angels contract in support of his interpretation of the agreement.[7]

This history begins with a contract the Wagners entered into with SGP to star in a television movie of the week, *Love Song*. As compensation for Wagner and Wood acting in *Love Song*, SGP agreed to pay them a fixed amount plus one-half the net profits derived from the "exploitation of all ancillary, music and subsidiary rights in connection therewith." The evidence shows the definition of net profits in the *Love Song* agreement was derived from a memorandum of understanding based on negotiations between SGP and the Wagners. SGP sent a copy of this "deal memo" to its counsel requesting counsel prepare a contract under which SGP, after recouping its costs, "will share equally (50/50) with [the Wagners] in all gross revenues derived from all sources from the exploitation of 'Love Song.'"

An early draft of the *Love Song* contract limited the Wagners' net profit to the net of "all monies received by the Producer as consideration for the right to exhibit the photoplay." The Wagners objected to this language as inconsistent with the "deal memo," which stated SGP's intent there be an equal split of all revenues "derived from all sources." They called for the phrase "and all rights therein" to be added immediately following the word "photoplay" and asserted these rights should be defined as "including but not limited to . . . remake rights, sequel rights, publication rights, legitimate stage rights, television rights, etc."

---

[4] *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641].

[5] *Wolf v. Superior Court, supra,* 114 Cal.App.4th at page 1351.

[6] *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 847 [44 Cal.Rptr.2d 227].

[7] Parol evidence of the negotiations underlying a contract is admissible to explain but not contradict the meaning of its terms. (*General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 442 [15 Cal.Rptr.2d 622].)

SGP's counsel responded to the Wagner's request for a revised definition of net profits, stating the language they wanted to include could be construed as granting them ownership rights in *Love Song*. Counsel affirmed, however, the Wagners were entitled to receive a share of "income from any and all sources and it is my opinion that the agreement so states."

The Wagners replied their intent was not to ask for ownership rights in *Love Song* "but merely to make certain [they] participated in all revenues from all sources."

After receiving this letter SGP's counsel revised the net profit definition to include profits "derived from all sources from the exploitation of the photoplay and all ancillary rights therein." In an accompanying letter counsel noted with respect to net profits: "I have made the change requested" and "covered your comment."

In the final *Love Song* contract net profits were not limited to monies received "for the right to exhibit the Photoplay." Instead they were defined as the net of "all monies received by Producer as consideration for the right to exhibit the Photoplay, *and* exploitation of all ancillary, music and subsidiary rights in connection therewith." (Italics added.)

### 2. *The* Charlie's Angels *agreement.*

Another provision of the *Love Song* agreement stated the Wagners would team up with SGP "to jointly submit up to five ideas to ABC for the basis of a pilot script for the 1974–1975 television season." The parties agreed if ABC accepted any of these ideas they would "enter into a business relationship . . . where the profits therefrom are shared equally between the parties." One of the ideas the Wagners and SGP submitted to ABC was a series called *"Harry's Angels."*

After ABC expressed interest in the series, renamed *"Charlie's Angels,"* the Wagners entered into negotiations with SGP under the joint submissions provision of the *Love Song* agreement discussed above. As in the *Love Song* agreement the parties agreed to a 50-50 share of the net profits. The *Charlie's Angels* agreement defines net profits as the net of "all monies actually received by Producer as consideration for the right to exhibit photoplays of the series and from the exploitation of all ancillary, music and subsidiary rights in connection therewith." This language is identical to the final definition of net profits in the *Love Song* agreement. In a letter to counsel for the Wagners, counsel for SGP noted the definition of net profits in the *Charlie's Angels* agreement "is not a standard definition, but has many changes more favorable to your clients than any such standard definition."

Wagner's argument is simple and straightforward. The net profits provision in the *Love Song* agreement was intended to give the Wagners a one-half share in the net profits received by SGP "from all sources" without limitation as to source or time. This intent was confirmed by SGP's attorney, who acknowledged the Wagners were entitled to receive "income *from any and all sources* and it is my opinion that the agreement so states this." The *Charlie's Angels* agreement was based on the *Love Song* agreement and defines net profits in identical language. Therefore, the *Charlie's Angels* agreement should also be interpreted as providing the Wagners with a 50 percent share in SGP's income "from all sources" without limitation as to source or time. Since Columbia admits it stands in SGP's shoes with respect to SGP's obligations under the *Charlie's Angels* agreement, Columbia is obligated to pay Wagner and the trusts 50 percent of the net profits derived from the Charlie's Angels movies.

B. *Wagner's Extrinsic Evidence Does Not Support a Meaning to Which the Contract Is Reasonably Susceptible.*

■ The problem with Wagner's extrinsic evidence is that it does not explain the contract language, it contradicts it. " 'Under the parol evidence rule, extrinsic evidence is not admissible to contradict express terms in a written contract or to explain what the agreement was. . . . The agreement is the writing itself. . . . Parol evidence cannot . . . be admitted to show intention independent of an unambiguous written instrument.' "[8] Thus, as Justice Holmes explained, parol evidence is not admissible to show that when the parties "said five hundred feet they agreed it should mean one hundred inches, or that Bunker Hill Monument should signify the Old South Church."[9]

■ Even if the Wagners and SGP intended the Wagners would share in the net profits "from any and all sources" they did not say so in their contract. What they said in their contract was the Wagners would share in "all monies actually received by Producer, as consideration for the right to exhibit photoplays of the series, and from the exploitation of all ancillary, music and subsidiary rights in connection therewith." For a right to be "subsidiary" or "ancillary," meaning supplementary or subordinate,[10] there must be a primary right to which it relates. The only primary right mentioned in the contract is "the right to exhibit photoplays of the series." Thus the Wagners were entitled to share in the profits from the exploitation of the movie rights to *Charlie's*

---

[8] *Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115–1116 [97 Cal.Rptr.2d 432], citations omitted.

[9] *Goode v. Riley* (1891) 153 Mass. 585 [28 N.E. 228].

[10] Webster's Third New International Dictionary (2002) pages 80, column 1, 2279, column 1.

*Angels* if those rights were exploited by Columbia as ancillary or subsidiary rights of its primary "right to exhibit photoplays of the series" but not if those rights were acquired by Columbia independently from its right to exhibit photoplays.

Thus, for example, if SGP held the motion picture rights to *Charlie's Angels* from the beginning or if it acquired them by exercising its right of first refusal as producer to purchase the rights from Goff and Roberts[11] then it could be said to have acquired those rights by exploiting its right to exhibit photoplays of the series and the Wagners would be entitled to a share of the profits. But if SGP (or Columbia) purchased the motion picture rights to *Charlie's Angels* on the open market, independent of any right it had as producer of the TV series, then it could not be said to have acquired those rights by exploiting its right to exhibit photoplays of the series and the Wagners would not be entitled to a share of the net profits.

III. *THE UNDISPUTED EVIDENCE SHOWS SGP DID NOT ACQUIRE THE MOTION PICTURE RIGHTS TO* CHARLIE'S ANGELS *BY EXPLOITING ITS RIGHTS AS PRODUCER OF THE TV SERIES.*

To understand how the producer of a television series acquires the motion picture rights in the series it is necessary to understand the concepts of "works made for hire" under the Copyright Act of 1909[12] and "separated rights" under the 1970 Writers Guild of America minimum basic agreement (MBA).[13]

A. *Works Made for Hire.*

The 1909 act provided the holder of the copyright in a work had "the exclusive right . . . [t]o . . . make any other version thereof."[14] It further provided, "the word 'author' shall include an employer in the case of works

---

[11] See discussion of the producer's right of first refusal at pages 594–595, below.

[12] Title 17 United States Code former sections 1 through 216 (35 Stat. 1075, as amended). Congress enacted a comprehensive revision to the 1909 act in the Copyright Act of 1976 (Pub.L. 94-553, 90 Stat. 2541) which became effective on January 1, 1978. The citations in this opinion are to the 1909 act, which was in effect at all times relevant to this opinion. The text of the 1909 act as amended is set out in 8 Nimmer on Copyright (2006) Appendix 6.

[13] The Writers Guild is the collective bargaining unit of screen and television writers which for decades has negotiated an industrywide collective bargaining agreement (the MBA) with motion picture and television producers governing the rights of its members. (Reiner, *Separation of Rights for Screen and Television Writers* (2001) 24 L.A. Law. 28, 30, hereafter Reiner.) It is undisputed the 1970 MBA applied to the contract between SGP and the writers of the *Charlie's Angels* pilot production, Goff and Roberts.

[14] Title 17 United States Code former section 1, subdivision (b).

made for hire."[15] Thus, unless the parties agreed otherwise a writer's employer owned all of the rights comprised in the copyright, including the right to use a work created for one medium in another medium.[16] It was not uncommon, however, for the parties to agree to a provision reserving to the employee writer the rights in certain media while the employer producer retained the rights in other media.[17]

Here Goff and Roberts, who wrote the teleplay for the *Charlie's Angels* pilot, entered into a contract with the producer, SGP, which provided in relevant part: "Producer hereby engages Artist to render services in the writing, composition, preparation and revision of the literary material described in paragraph 3 hereof [a complete pilot script entitled 'Charlie's Angels']. . . . Artist agrees that all material composed, submitted, added and/or interpolated by Artist hereunder shall automatically become Producer's property and that Producer, for this purpose, shall be deemed the author thereof, Artist acting entirely as Producer's employee." Thus, if there had been no further provision in the contract concerning media rights SGP would have had the exclusive right to exploit the *Charlie's Angels* television series in a motion picture, stage play, comic book or any other media.

### B. *Separated Rights.*

The contract between Goff and Roberts and SGP did contain additional provisions concerning media rights, however. The contract stated: "The parties acknowledge that this agreement is subject to all of the terms and provisions of the applicable [MBA] and to the extent that the terms and provisions of the [MBA] are more advantageous to Artist than the terms hereof, the terms of the [MBA] shall supersede and replace the less advantageous terms of this agreement." As we shall explain, the "separated rights" provision of the MBA was more advantageous to Goff and Roberts than the "works made for hire" provision of their contract with SGP. Therefore in determining the rights of the parties the MBA's "separated rights" provision prevailed over the contract's "works made for hire" provision.

Article 16B of the MBA, entitled "Separation of Rights," provided in relevant part the producer "agrees that separation of rights . . . shall be accorded to the writer of a format, story, or story and teleplay for any television film." The rights were separated as follows: "[Producer] shall own the exclusive film television rights in the literary material to which the

---

[15] Title 17 United States Code former section 26.

[16] 1 Nimmer on Copyright, *supra,* section 5.03, page 5-56.9.

[17] 1 Nimmer on Copyright, *supra,* section 5.03, page 5-56.9, citing the 1960 Writers Guild of America MBA.

provisions of this Article 16B apply . . . . Writer shall retain all other rights . . . including but not limited to . . . theatrical motion picture . . . rights."

Article 50 of the MBA described the rights and duties of the producer and writer with respect to separated rights. It stated: "The writer of any literary material subject to the provisions of Article 16B hereof and the [producer] agree that they will take no action with respect to the rights reserved to the writer or granted to the [producer] which will cause or permit such literary material to become a part of the public domain in the United States. Insofar as such literary material is covered by the copyright of the television film, the rights reserved to the writer hereunder will be held in trust for such writer by the owner of the copyright. . . . Without limiting the generality of the foregoing, [producer] agrees to execute and deliver to writer an assignment under the copyright of all rights in the copyright reserved or which may revert to writer pursuant to the provisions hereof . . . ."

Thus, in the present case, SGP owned the copyright to *Charlie's Angels* and held "the exclusive film television rights in the literary material"; in other words it had "the right to exhibit photoplays of the series." SGP also held in trust for Goff and Roberts the separated right to generate motion pictures based on the series.[18]

Despite the provision in the MBA conferring the motion picture rights in a teleplay on the writers of the teleplay, the producer retained a "limited interest in such rights." As relevant here, this "limited interest" consisted of the right of first refusal should the writer decide to offer the movie rights for sale within five years from the date the writer delivered the teleplay to the producer. After the five-year period expired the producer could still purchase the movie rights but it had to do so on the open market and in competition with any other producer who wanted to purchase those rights.

Consequently, if Columbia had produced Charlie's Angels movies based on motion picture rights its assignor SGP had acquired from Goff and Roberts under SGP's right of first refusal, Columbia could be said to have "exploited" an ancillary or subsidiary right, i.e., movie making, in connection with "the right to exhibit photoplays of the series" and the Wagners would be entitled to a share of the movies' profits.

However, as we discuss below, there is no evidence SGP ever acquired the motion picture rights to *Charlie's Angels* by exercising its right of first refusal or in any other way connected to its right to exhibit photoplays of the series.

---

[18] It is undisputed Goff and Roberts were eligible for separated rights under the MBA.

C. *SGP Did Not Acquire the Motion Picture Rights to* Charlie's Angeles *by Exercising a Right Connected to Its Right to Exhibit Photoplays of the Series.*

Columbia produced sufficient evidence to make a prima facie showing SGP never acquired the motion picture rights from Goff and Roberts. This evidence included the contract under which Columbia purportedly purchased from the heirs of Goff and Roberts "the right to create and produce motion pictures . . . based upon the television series created by Ben Roberts and Ivan Goff entitled 'Charlie's Angels.' " In addition, Columbia submitted the deposition testimony of Marvin Katz and the declaration of Gregory Boone. Katz, a former senior executive of SGP, testified it was his understanding SGP never acquired Goff's and Roberts's reserved rights in *Charlie's Angels.* Boone, an executive with Sony Pictures Television, testified that in the early 1990's he was asked to look into the issue of who owned the motion picture rights to the *Charlie's Angels* television series. Boone conducted a search of the business records of SGP, which Columbia obtained after it purchased SGP's assets, and "did not locate any evidence in SGP's business records to suggest that SGP owned the theatrical motion picture rights for 'Charlie's Angels.' "

The reasonable inference from this evidence is that SGP did not acquire the motion picture rights to *Charlie's Angels* before it sold its assets to Columbia in 1982, more than six years after Goff and Roberts wrote the pilot episode. This inference, of course, may be rebutted "by other inferences or evidence, which raise a triable issue as to any material fact."[19] The record contains no such inferences or evidence.

The only evidence SGP might have acquired Goff's and Roberts's movie rights is a document entitled "Copyright Assignment Nunc Pro Tunc" executed by SGP on May 5, 1982, a few days after it sold its assets to Columbia.

The first paragraph of the "Copyright Assignment" states "[SGP] has *sold,* assigned, transferred and set over . . . unto [Columbia] *the sole and exclusive motion picture rights* and certain other rights in and to those certain television motion pictures set forth on Schedules 'A' through 'H' attached hereto . . . all as more particularly set forth and enumerated, and upon and subject to the terms and conditions set forth in that certain agreement between [SGP] and [Columbia] dated as of April 30, 1982 . . . ." (Italics added.) Schedule A is a list of *Charlie's Angels* television episodes.

The second and third paragraphs of the Copyright Assignment empower Columbia to take all steps necessary to assure *Charlie's Angels* and the other

---

[19] Code of Civil Procedure section 437c, subdivision (c).

properties listed in the schedules do not fall into the public domain and to prosecute any action necessary to protect the copyrights in those properties from infringement.

Wagner reasons SGP would not have represented it sold rights to Columbia it did not own. Therefore, he argues, the first paragraph of the Copyright Assignment, reciting SGP "sold" the motion picture rights in *Charlie's Angels* to Columbia, should be viewed as raising a triable issue as to whether SGP acquired the motion picture rights from Goff and Roberts by exercising its right of first refusal under the MBA. We are not persuaded by this argument for two reasons.

Although the Copyright Assignment states SGP sold the motion picture rights in *Charlie's Angels* to Columbia it also states the sale of the motion picture rights was subject to the "terms and conditions" of the April 1982 purchase agreement with Columbia. Under this agreement Columbia's purchase of SGP's assets was expressly subject "to all SGP['s] . . . industry-wide collective bargaining agreements," which would include the 1970 MBA under which Goff and Roberts, not SGP, held the motion picture rights to *Charlie's Angels*.[20] These two statements are not contradictory because under article 50 of the MBA the producer did not "sell" the separated rights to the writer. Rather, it "assigned" those rights to the writer. The assigned rights continued to be "owned" by the producer but "held in trust" for the writer. The purpose of SGP's Copyright Assignment, as shown by the second and third paragraphs, was to protect the properties from copyright infringement or becoming part of the public domain—a duty imposed on SGP under article 50 of the MBA.

Even if we viewed the Copyright Assignment as evidence SGP held the motion picture rights to *Charlie's Angels* when it sold its assets to Columbia, the Copyright Assignment is not evidence SGP acquired those rights by exercising its right of first refusal under the MBA.[21] SGP's right of first refusal under the MBA expired five years from the date Goff and Roberts delivered the pilot teleplay to SGP. We do not know the date Goff and Roberts delivered the teleplay but we do know it had to have been sometime before the pilot aired on March 21, 1976.[22] We also know SGP sold its television assets to Columbia in April 1982. Therefore, SGP could have acquired the movie rights *after* its right of first refusal expired by purchasing them on the open market just as any other studio could have done.

We conclude, therefore, a reasonable trier of fact could not find, based on the language of the Copyright Assignment that SGP acquired the motion

---

[20] See discussion at pages 594–595, above.

[21] See discussion at page 595, above.

[22] <www.imdb.com/title/tt0073972/episodes#season-1> (as of Jan. 8, 2007).

picture rights to *Charlie's Angels* by exercising a right connected to its right to exhibit photoplays of the series.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Woods, J., and Zelon, J., concurred.