Filed 3/27/18 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DONALD PEARSON and TONYA PEARSON.<br><br>TONYA PEARSON,<br><br>    Appellant,<br><br>    v.<br><br>DONALD PEARSON,<br><br>    Respondent. | D070360<br><br>(Super. Ct. No. DN149531)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>**CHANGE IN JUDGMENT** |

THE COURT:

It is ordered that the opinion filed on March 12, 2018 be modified as follows:

Page 39, the third full paragraph, beginning "We therefore conclude" is deleted

and the following paragraph is inserted in its place:

> Nonetheless, because we remand to the superior court for further consideration of one of the section 4320 factors, Tonya's ability to work, we also direct the court to consider whether any change in its analysis regarding that factor also impacts its refusal to award additional needs-based attorney's fees to Tonya pursuant to section 2030.

Page 40, the paragraph following the DISPOSITION is deleted and the following

paragraph is inserted in its place:

> The order is reversed in part, and the matter is remanded to the
> superior court for further consideration of whether Tonya is able to
> work and what effect, if any, her inability to do so should have on
> the amount of spousal support and attorney's fees, consistent with
> the analysis provided in this opinion. In all other respects, the order
> is affirmed. The parties shall bear their own costs on appeal.

> **This modification changes the judgment.**

> Appellant's petition for rehearing is denied.

McCONNELL, P. J.

Copies to: All parties

Filed 3/12/18 (unmodified version)

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of DONALD PEARSON and TONYA PEARSON. | D070360 |
| TONYA PEARSON, | |
| Appellant, | (Super. Ct. No. DN149531) |
| v. | |
| DONALD PEARSON, | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, David B. Oberholtzer, Judge.  Affirmed in part and reversed in part with directions.

Stephen Temko and Dennis Temko, for Appellant.

Gavin & Dersch Law and Mediation, Wayne D. Dersch and Garrett C. Dailey, for Respondent.

_____

[*]     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I & II of the Discussion.

In August 2009, Tonya and Donald Pearson dissolved their marriage and entered into a Marital Settlement Agreement (MSA) in which they agreed to the division of their marital assets and that Donald would provide ongoing spousal support to Tonya. Despite this purported agreement, the parties engaged in extensive litigation, primarily initiated by Tonya, over the course of the next six years. Tonya now appeals from a postjudgment order of the superior court deciding various requests for orders to modify spousal support, adjudicate omitted assets, and award sanctions or attorney's fees.

Tonya asserts the court erred in its decision by: (1) concluding the term "bonus" in the MSA did not include certain restricted stock and relocation monies; (2) placing a cap on the amount of Donald's future bonuses available for support; (3) determining that she had the ability to work; (4) awarding Donald attorney's fees in the form of sanctions pursuant to Family Code section 271[1]; and (5) denying her request for additional needs-based attorney's fees pursuant to section 2030. With respect to most of these rulings, we conclude the court did not err. With respect to the orders modifying spousal support, we conclude the court correctly determined that Donald's increase in bonus pay constituted a change of circumstances sufficient to warrant a modification of spousal support, but that substantial evidence does not support certain of the court's findings regarding Tonya's ability to work. We therefore affirm in part, reverse in part, and remand the matter for limited further proceedings in accord with this opinion.

---

[1] Further statutory references are to the Family Code unless otherwise stated.

FACTUAL AND PROCEDURAL BACKGROUND

Donald and Tonya were married for over 30 years. During their marriage, Tonya primarily stayed home with their children while Donald supported the family financially and furthered his career in the banking industry. As a bank executive, Donald received a substantial salary, as well as cash bonuses and long-term incentives in the form of stock options and restricted stock.

The couple separated in January 2008. Donald's annual income at the time of the separation was approximately $300,000 per year, including his base salary and annual cash bonuses. Tonya was not working at the time of the separation but obtained a job as a receptionist shortly thereafter.

The couple began negotiating the terms of the divorce and, in May 2008, vocational expert Kathleen Young provided an opinion regarding Tonya's wage-earning capacity. Young noted that Tonya was earning $15 per hour but was only working 20 hours per week in her current position, and concluded Tonya had the potential to work a full 40 hours per week while earning approximately $15-16 per hour. She opined that Tonya's earning capacity would not increase significantly with further training, but suggested Tonya ask her employer about courses within the financial industry that might provide upward mobility in her current position.

Young identified a number of available full-time positions that Tonya was qualified for, but suggested she stay in her current position for the next six months with the goal of converting it to a full-time position, as the job market was competitive and Tonya might be subject to age discrimination. Tonya's job did not become full time and,

3

instead, she was laid off just a few months later. Thereafter, she returned to a previous employer to work part time as a retail sales associate, making $10.85 per hour.

In August 2008, Donald accepted a new position with his employer, Wells Fargo, that required him to move to Oregon. He negotiated a significant increase in his base salary, along with an agreement that Wells Fargo would provide a substantial relocation package and pay his bonus for 2008 based on his performance in his current region, as the region he was to take over was not doing as well. Tonya learned of the relocation no later than November of that same year.

*Martial Settlement Agreement*

After stipulating to a temporary support order, Donald and Tonya attended a mandatory settlement conference and reached an agreement regarding the division of marital assets and ongoing spousal support. Tonya's attorney read the agreement into the record and also filed a written MSA delineating the terms of the agreement. The agreement required Donald to pay Tonya spousal support in the amount of $7,500 per month plus 35 percent of "any gross bonuses received by [Donald], commencing August 15, 2009, and continuing thereafter until the death of either party or the remarriage of [Tonya], whichever occurs first, subject to the jurisdiction of the Court to alter, modify, or terminate this provision upon a proper showing having first been made to the Court." The agreement noted the spousal support was premised on Donald's monthly income of approximately $25,000 per month, less expenses, and an imputation of 40 hours of work per week at an hourly rate of $16 for Tonya. The court incorporated the written agreement into a final judgment of dissolution entered on December 8, 2009.

4

Thereafter, and over the course of the next five years, Tonya and Donald engaged in extensive litigation related to the MSA. Although a full review of the litigation is not necessary, we summarize certain of the intermediate proceedings relevant to Tonya's arguments before turning to the details of the August 2016 postjudgment order at issue in the present appeal.

*June 2010 Request for Modification*

Less than a year after the court entered the MSA, Tonya filed her first request for orders (RFO) asking the court to modify the spousal support agreement. Donald's annual bonus for 2009 had been significantly lower than previous years[2] and, although it was primarily due to the poor performance of the region he had recently taken over, Tonya read some articles discussing changes to the compensation of executives in the banking industry and believed Donald may have received additional shares of restricted stock or stock options in lieu of a portion of his typical cash bonus. In addition, Tonya asserted she was only working part time for less than $15 per hour, and had been unable to find another more lucrative position. She therefore asked the court to award her additional support, and also argued the court should interpret the bonus provision in the MSA to include 35 percent of any stock options that Donald received in lieu of a cash bonus. In response, Donald filed a motion for sanctions claiming that Tonya submitted her motion to modify support in bad faith.

---

[2]    Thereafter, Donald's annual income and Tonya's annual spousal support payments increased each year, eventually surpassing the amount both parties received in 2009, the first year after the separation.

5

Judge Pollack heard the RFO and questioned Tonya about her understanding of the bonus clause at the time she agreed to the MSA. Their exchange was as follows:

"The Court: Okay, let me ask you some questions, and I'm going to tell you in a moment why I think it might be significant. In your mind, did you see bonus different than stock options? Ms. Cleary says she sees them as different concepts.

"[Tonya]: Yes, definitely.

"The Court: Why 'definitely'? Why is that different?

"[Tonya]: Because a bonus is something you get every year, you have to cash them out. Stock option is something you got every year.

"The Court: But at the time you entered into this agreement, 35 percent of any bonuses, you were thinking the year-end cash bonus?

"[Tonya]: Yes.

"The Court: And you were not thinking of stock options, exercising stock options?

"[Tonya]: I asked about the stock options. I don't—I was—only thought that I could get the ones that were awarded during the marriage, that was my understanding.

"The Court: All right. I want to be clear on this then. 35 percent of gross bonuses that you agreed to, in your mind, you felt that was 35 percent of the year-end cash bonus as opposed to 35 percent of the stock options; is that correct?

"[Tonya]: Well, I knew there was a difference, but as I tried—we had used cash from stock options to live the last seven years.

"The Court: Well, that wasn't my question. I'm trying to go into your state of mind at the time you signed this agreement, when you agreed to 7500 per month, plus 35 percent of gross bonuses, did you think the gross bonuses were limited to the year-end cash payment?

"[Tonya]: Yes.

"The Court: Okay. All right.

6

"[Tonya]: I was not aware I could get the other."

Judge Pollack issued a written decision on the RFO in February 2012. He found that Tonya was aware Donald had accepted a new position and a relocation package at the time of the agreement, such that any related payments Donald received would have been included in the MSA as arrears. Similarly, he concluded that any amounts due to Tonya related to stock options Donald received between separation and August 15, 2009, would have been included in the MSA as arrearages, as the MSA divided the options received before the date of separation. Based on her testimony at trial, the court found that Tonya understood the term "bonus" in the MSA to refer specifically to the year-end cash bonus Donald typically received, and not the stock options. Thus, by terms of the parties' own agreement, stock options received after entry of the MSA were Donald's separate property and were not bonus income.

Addressing spousal support more generally, Judge Pollack found that the marital standard of living at the time of separation had been $300,000 per year, that Tonya continued to earn approximately the same wages as she did at the time she negotiated the MSA, and that as a result there had been no material change in circumstances sufficient to justify a change in spousal support. Finally, the court denied Donald's motion for sanctions and awarded Tonya $10,000 in attorney's fees and costs pursuant to section 2030—compensating her for only a portion of the $44,000 in fees she accrued in connection with the RFO.

7

*Dispute Regarding the Qualified Domestic Relations Orders (QDROs)*

In 2012, another dispute arose regarding the division of stock options as set forth in the MSA. Donald's attorney had prepared qualified domestic relations orders (QDROs) to split the 401(k) plan funds accumulated prior to the separation, and Tonya's attorney requested several changes. Although Donald's attorney attempted to incorporate the changes, the parties failed to reach an agreement and Donald filed a request for an order to have an Elisor appointed to sign the QDROs on Tonya's behalf. Tonya opposed Donald's request and asserted that the QDROs did not fairly account for all of the 401(k) funds, but was unable to effectively explain her concerns to the court. Judge Pollack heard the motion and appointed the Elisor. Thereafter, Donald submitted the signed QDROs to Wells Fargo, but Wells Fargo rejected them as they contained language inconsistent with the retirement plan's guidelines.

*January 2013 RFO Seeking a Modification to Spousal Support*

In January 2013, Tonya filed another RFO in which she again sought to modify spousal support. She also asked the court to adjudicate omitted assets, to appoint a special master to perform an accounting and determine the marital standard of living, and to award her attorney's fees and costs. Tonya explained that her physician had diagnosed her as having bilateral osteoarthritis in both hands, she had left her employment as a sales associate in October 2012 as a result (subject to a worker's compensation claim), and she was unsure when, or if, she would be able to return to work. She stated she was currently unable to meet all of her monthly financial obligations—which included a first and

8

second mortgage on the family home she received pursuant to the MSA[3] and monthly payments on a number of credit cards—but also declared that she had over $400,000 in assets and still expected to receive 50 percent of Donald's various 401(k) accounts.

In response, Donald argued that Tonya's claims were baseless because Judge Pollack had already decided the same issues in the February 2012 Statement of Decision and that the RFO was a continuation of "her persistent and endless litigation over the same issues." He therefore asked the court to sanction Tonya pursuant to section 271.

In a supplemental declaration, Tonya asserted that Donald failed to disclose certain marital assets and, in a subsequent related pleading, she again claimed that Wells Fargo was providing a portion of his bonus in the form of stock instead of cash and that Donald had concealed associated changes to his bonus plan. Donald denied hiding any assets or changes to his bonus plan. He conceded that his base pay and bonuses had increased since separation but asserted there was no basis for Tonya to claim a share of his increased earnings post-separation because the MSA fairly accounted for the marital standard of living at the time of the separation. He alleged Tonya had not worked full time since their separation, despite the imputation of income based on working 40 hours per week in the MSA; that Tonya's employer had denied her disability claim; and that he had recently witnessed her driving and holding an umbrella for an extended period without a wrist guard. He argued there was no justification for an increase in spousal

---

3      The MSA indicated Tonya would receive the home as her sole and separate property "at a value of $630,000 subject to Wife's separate property claim of $35,142 and debt of $75,000." She was required to refinance the loan on the home to remove Donald's name.

support, and instead asked the court to decrease the amount of spousal support and award him sanctions under section 271 based on Tonya's consistent and "vexatious" litigation.

*May 2013 RFO to Set Aside the QDROs and Motion to Dismiss Previous RFOs*

In May 2013, Tonya filed an RFO asking the court to set aside the Elisor-signed QDROs based on her allegations that Donald had hidden certain 401(k) accounts. She also requested an award of sanctions pursuant to section 271 and needs-based attorney's fees and costs. In August, she filed an ex parte request to dismiss her January 2013 RFO, explaining that the parties had resolved their disputes as to many of the allegedly omitted assets. She maintained her most recent request that the previously executed QDROs be set aside. Donald opposed the dismissal, based on the history of litigation between the parties, and the court denied Tonya's request.

*December 2013 Ex Parte Request for Fees*

In December 2013, Tonya filed another RFO for needs-based attorney's fees, asserting that she needed $100,000 to obtain an attorney prior to the evidentiary hearing on her other pending RFOs. Judge Powazek heard the request in early 2014 and, after considering the extensive history of contentious litigation between the parties and their relative financial capabilities, awarded Tonya $15,000 toward "her reasonable attorney's fees necessary to litigate only the issues before the court." Thereafter, the court closed discovery and set a long-cause hearing for September 2014 to address Tonya's remaining RFOs. Around the same time, Donald accepted another promotion and relocation, which included another substantial increase in pay and a generous relocation package.

10

*RFO to Reopen Discovery*, *Continue the Trial Date*, *and Revisit Judge Pollack's 2012 Statement of Decision*

In August, a month before the scheduled long-cause hearing, Tonya filed another RFO asking the court to continue the trial date and reopen discovery, based primarily on allegations that Donald had concealed information and Wells Fargo had produced false information in response to her subpoenas. She also filed a second RFO asking the court for a "judgment different than that announced," to correct a clerical error, and for additional attorney's fees and costs. Tonya claimed she never received a copy of Judge Pollack's February 2012 Statement of Decision or any associated findings and orders after hearing. She asked that the court reconsider the decision and argued it was erroneous because Donald had concealed information regarding his accounts and assets and Judge Pollack had improperly relied on the MSA to determine the marital standard of living. Regarding the clerical error, she asserted the parties had stipulated in 2009, before entry of the MSA, that Donald would pay her 35 percent of any bonus payment received that year, but the related order, also entered before the MSA, left out the words "this year".

The case was assigned to Judge Oberholtzer. A hearing was set to address Tonya's latest RFOs with the pending RFOs to modify support, conduct an accounting, and for sanctions to trail. Judge Oberholtzer concluded that Judge Pollack's February 2012 Statement of Decision was a final order and denied Tonya's request to correct the alleged clerical error in the earlier 2009 order. He also denied Tonya's request to reopen discovery and found that the pending issues were "not that complex." He awarded Tonya

11

an additional $15,000 in attorney's fees and continued the trial on the remaining RFOs from September to November 2014.

*Evidentiary Hearing*

After further delays, in August 2015 Judge Oberholtzer held an evidentiary hearing on Tonya's RFOs to modify spousal support and for an accounting, as well as the associated competing requests for sanctions. At the hearing, Tonya testified that when she previously testified she thought "bonus" in the MSA meant Donald's cash bonuses, she was including any money he received from cashing in stock as well. She conceded, though, that she was essentially asserting the same claim as she made before Judge Pollack, and also testified that she was on medication and thus was not thinking clearly when she answered Judge Pollack's questions at the previous hearing.

Regarding her medical condition, Tonya testified that she began experiencing pain sometime in 2010 and began seeing Dr. Gelb in October 2012. She stopped working after her first appointment with Dr. Gelb based on his recommendation. She stated it was painful to open doors, handle papers, pinch, grasp, pick up money or do several other tasks. She admitted she had not made efforts to find a job that would accommodate her medical condition, but also indicated she was not aware of any such jobs given the array of issues she was facing.

Dr. Gelb also testified regarding Tonya's medical condition and the related limitations. When asked about her ability to type on a keyboard, Dr. Gelb stated she could probably do so, but that she had small joint arthritis in her fingers and the pain in her thumbs would be aggravated by the use of the space bar. He said she would need to

12

do a work evaluation with an occupational therapist to determine more specifically how and for how long she could use a keyboard. Ultimately, he concluded the totality of her numerous ailments, many of which had been objectively verified by clinical findings, made her ability to perform any work (other than sedentary work that did not require any manipulation of her hands) extremely limited.

Donald testified that he did not believe Wells Fargo made any significant changes to the structure of the bonus programs applicable to him since the date of his separation from Tonya, and that he had never received restricted stock or any other form of payment other than cash in connection with his annual bonus. In addition, he stated that his compensation, including his bonus plans, followed the same structure as other individuals at Wells Fargo with the same position in different locations. He explained that his compensation package changed along with his job title when he moved to Oregon, and that his bonus the first year was unusually low due to the market and the performance of his region, but that his base salary and bonuses increased thereafter due to his promotions.

*Judge Oberholtzer's January 2016 Statement of Decision*

Judge Oberholtzer issued a written statement of decision—the decision Tonya now challenges on appeal—in January 2016. He found that there had been some confusion about the 401(k) funds, and specifically that both parties lost track of certain nonqualified plans that had been split off from the qualified plans, but that Donald had not intentionally concealed any funds and Tonya had been aware of their existence for some time. While the QDROs that the Elisor signed did not properly divide all of the funds,

13

the court noted that the discrepancy could have been resolved much sooner if Tonya had clearly explained the issue and the parties had taken the time to examine one another's objections. Thus, the court found the errors in the QDROs were the result of a mistake, both parties shared some of the blame, and there were no intentionally omitted assets.

Regarding the term "bonus," the court explained that a spousal support order setting a fixed monthly support amount as well as a percentage of an annual bonus was a common arrangement as set forth in *Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 40 (*Ostler & Smith*). Thus, in this context, the term "bonus" typically refers to "additional remuneration paid to an employee for meeting or exceeding performance goals in the past" and is distinguishable from stock options. Thus, although the court acknowledged that "bonus" could have a broader meaning in other contexts, it concluded the term referred only to a variable performance bonus in the context of the MSA in this case. Further, the court noted Tonya's testimony confirming that, at the time she agreed to the MSA, she interpreted the bonus provision in a manner consistent with the court's interpretation of the term. Accordingly, Judge Oberholtzer determined that the term "bonus" excluded both the restricted stock rights Donald received as part of a long-term incentive plan and the relocation monies he received in accordance with his promotions.

As to spousal support more generally, the court found there was a change of circumstances necessitating a modification of spousal support, not because of Tonya's inability to work but rather because of the significant increase in bonus pay that Donald had received following his two promotions. The court therefore modified the provision of the MSA requiring Donald to pay 35 percent of any bonus to Tonya as spousal support

14

by setting a cap of $250,000 on the amount of Donald's annual bonus available for support.

With respect to Tonya's ability to work, the court went on to address the factors set forth in section 4320. In that context, it found that Tonya had not followed up on the recommendations for acquiring additional skills set forth in the 2008 vocational evaluation, and that her treating orthopedic surgeon, Dr. Gelb, did not agree she was unable to work. The court conceded that Dr. Gelb had testified Tonya had some limitations, but found that Tonya had no restrictions using a keyboard, nothing precluded her from working full time, and most of her complaints could be ameliorated by surgery. The court also addressed the remaining section 4320 factors, noting specifically that spending had been a source of friction throughout the marriage and that it appeared Tonya had continued to overspend after the marriage despite her limited ability to work. Thus, the court declined to make any modifications to the spousal support beyond the cap on Donald's bonuses.

Regarding sanctions, the court noted that Tonya had repetitively filed motions and then tried to dismiss them after much of the preparation was done only to refile the same motion again later. It documented its conclusions in this regard by attaching a list of Tonya's various motions over the years. Regarding the QDROs, the court found that Tonya had available to her all of the information necessary to resolve the issue but instead chose to accuse Donald of fraud and engage in frivolous litigation. Thus, the court sanctioned Tonya pursuant to section 271 in the amount of $50,000. To avoid imposing an unreasonable financial burden on Tonya, the court permitted Donald to

15

withhold $25,000 per year from the amount he paid as her share of the annual bonus, to begin only after she paid off additional amounts owed to him in a similar manner.

Concerning needs-based attorney's fees and costs, the court reiterated that Tonya had engaged in unnecessary litigation and that she had already been awarded $15,000 as the amount reasonably necessary to pursue her claims. Therefore, the court declined to award Tonya any additional attorney's fees or costs.

DISCUSSION

## I. *Meaning of "Bonus" In the MSA*

We turn first to the meaning of the word "bonus" in the MSA. Tonya asserts that, as a matter of law, the California Supreme Court has defined "bonus" as something that is given in addition to the agreed upon compensation that is strictly due, and that both the relocation funds and the restricted stock Donald received fall within that definition because they were not strictly due. (See *Jones v. Webb* (1924) 195 Cal. 88, 90.) Donald asserts the term "bonus" was reasonably susceptible to a specific meaning in the context of the MSA, and that the extrinsic evidence supports the trial court's interpretation of the term.

### A. *Applicable Legal Principles*

When construing a term in a judgment of dissolution that incorporates an agreement between the parties, the court applies the general rules governing the interpretation of contracts. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 948 (*Minkin*).) The primary objective is to give effect to the mutual intentions of the parties. (*Ibid.*; Civ. Code, § 1636.) The court typically determines the mutual intent first by

16

examining the words the parties chose and, when the language of the agreement itself is clear and unambiguous, that language governs. (*Minkin*, *supra*, at p. 948.) If a particular term in the agreement is ambiguous, however, the court may also consider extrinsic evidence to prove the parties intended a specific meaning to which a given term is reasonably susceptible. (*Ibid.*; *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439 (*Iberti*).) For example, the court may consider evidence concerning the circumstances under which the parties negotiated the contract, the subject matter of the contract, and the subsequent conduct of the parties. (*Iberti*, *supra*, at p. 1439.) But it is the expressed objective intent of the parties—and not the unexpressed subjective intent of any one party—that governs. (*Ibid.*)

In dissolution proceedings concerning marriages lasting 10 years or more, the trial court maintains jurisdiction as to spousal support indefinitely absent an express written agreement of the parties to the contrary. (§ 4336; *Iberti*, *supra*, 55 Cal.App.4th at p. 1441.) If the parties have agreed upon the terms of spousal support, in an MSA or associated judgment of dissolution, the trial court's ongoing jurisdiction includes the resolution of disputes concerning the proper interpretation of the terms of the agreement. (*Iberti*, *supra*, at p. 1441.)

B. *Standard of Review*

Where the language of the MSA is unambiguous, or when the parties have not submitted any competent extrinsic evidence or where the extrinsic evidence is not in conflict, the proper interpretation of the MSA presents a question of law for the trial court. On appeal, the appellate court reviews the record de novo and independently

17

construes the term. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*); *Minkin*, *supra*, 11 Cal.App.5th at pp. 948-949.) Similarly, the trial court's determination of whether a given term is susceptible to more than one interpretation is also a question of law subject to de novo review on appeal. (*Wolf*, *supra*, at p. 1351; *Minkin*, *supra*, at pp. 948–949.) Once it is determined that a given term is subject to more than one interpretation, however, the appellate court gives deference to the trial court's review of any conflicting extrinsic evidence as well as any associated credibility determinations, and upholds the trial court's interpretation of the term so long as substantial evidence supports it. (*Wolf*, *supra*, at p. 1351; *Minkin*, *supra*, at pp. 948-949.)

Here, Tonya and Donald agree on the law relating to the standard of review but dispute its application to the present case. Tonya argues our review should be de novo because the California Supreme Court has already defined the term as a matter of law and neither party offered any competent extrinsic evidence. Donald argues the substantial evidence standard of review applies because the trial court considered significant amounts of extrinsic evidence regarding the meaning of the term.

While much of the evidence Donald refers to did not relate directly to the meaning of the term "bonus," the trial court's written decision does indicate the court concluded the term was reasonably susceptible to more than one meaning. The court acknowledged the term could carry a broader meaning, but found it had a more specific meaning in the context of the type of support agreement at issue. It further found that Tonya and Donald's intent at the time they entered into the MSA was consistent with the more specific meaning. We review the trial court's conclusion that the term was ambiguous de

18

novo, but review any factual findings supporting the court's interpretation of the term for substantial evidence. (See *Wolf*, *supra*, 114 Cal.App.4th at p. 1351; *Minkin*, *supra*, 11 Cal.App.5th at pp. 948-949.)

C. *Analysis*

1. *"Bonus" is reasonably susceptible to a particularized meaning in the context of spousal support arrangements*

We first consider, de novo, the trial court's conclusion that the term "bonus" in the MSA is reasonably susceptible to more than one meaning.

Judge Oberholtzer found the case of *Ostler & Smith*, *supra*, 223 Cal.App.3d 33 instructive on this point. There, the supporting party received substantial but inconsistent income due to fluctuating annual bonuses. The court approved a support arrangement in which the supporting party provided a fixed monthly support payment plus a percentage of any annual performance based cash bonuses as one acceptable way to balance the various factors set forth in section 4320. (*Ostler & Smith*, *supra*, at pp. 46-50.) Since then, parties and courts have followed a similar approach in agreeing to or awarding spousal support, often referencing the *Ostler & Smith* case as the model. (See, e.g., *Minkin*, *supra*, 11 Cal.App.5th at p. 949; *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1472, fn. 2; *In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 25; *In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93-94 (*Kerr*).)

Although the definition of "bonus" was not explicitly at issue in *Ostler & Smith*, the opinion indicates the court was referring to an annual bonus attributable to work performed in the previous year, and did not include stock or stock options that the

19

supporting party also received. (*Ostler & Smith*, *supra*, 223 Cal.App.3d at p. 38.) As a result, courts generally understand an "*Ostler & Smith*" provision to be an additional award of spousal support, beyond a fixed monthly support, expressed as a fraction or percentage of any discretionary bonus actually received, intended "to capture fluctuations in the supporting spouse's income that are not included in a flat rate amount of support". (*Minkin*, *supra,* 11 Cal.App.5th at p. 949.) In *Kerr*, *supra*, 77 Cal.App.4th at page 95, the court specifically distinguished stock options from the annual bonuses at issue in *Ostler & Smith* provisions, and explained that a percentage based award of stock options would not address the annual income fluctuations that courts intend to capture with *Ostler & Smith* type provision. (*Kerr*, *supra*, at p. 95.) Therefore, we agree with the trial court that, as a matter of law, the term "bonus" in an *Ostler & Smith* style spousal support agreement is reasonably susceptible to a particular meaning—annual performance based cash bonuses—based on the context of the agreement.

Tonya argues the trial court should have concluded instead that the term "bonus" has a discrete meaning as a matter of law, consistent with the definition set forth by the California Supreme Court in *Jones v. Webb*, *supra*, 195 Cal. 88, 90. But that case is inapposite. In *Jones v. Webb*, the court addressed whether a contract between an owner of agricultural land and a "foreigner ineligible to citizenship" hired to plant and harvest the land violated a statute that prohibited noncitizens from owning or possessing long-term leases over agricultural land, and thus precluded noncitizen workers from sharing in the profits generated from such lands. (*Id*. at p. 89.) The court determined that a "bonus" was simply "something given in addition to what is ordinarily received by, or strictly due

20

to, the recipient," and that calling a profit share agreement a "bonus" did not change the legal effect of the arrangement. (*Id*. at pp. 89-90.) The court therefore determined the word "bonus" as used in the particular employment agreement at issue was nothing more than "mere surplusage" and that the contract was invalid under the statute as it was, in reality, a profit sharing agreement. (*Id*. at p. 90.) We find the California Supreme Court's definition in the context of the applicability of a specific antiquated statute to a specific employment contract to be far less relevant here than the interpretation offered in the more recent cases specifically addressing the use of the term in the context of contemporary spousal support agreements.[4]

    *2. Substantial evidence supports the trial court's interpretation of "bonus" in the context of the MSA*

Having decided the term is ambiguous, we next consider whether substantial evidence supports the superior court's interpretation of the term in the present case. As discussed, courts typically interpret such provisions as applicable to annual performance based cash bonuses, and at least one court has concluded that a percentage based *Ostler & Smith* type arrangement would not be appropriate for stock options. (See *Minkin*, *supra*, 11 Cal.App.5th at p. 949; *Kerr*, *supra*, 77 Cal.App.4th at p. 95.) Although the agreement here does not specifically refer to the *Ostler & Smith* decision, counsel with

---

[4]    The other cases Tonya relies upon are similarly distinguishable, as each discusses the term "bonus" in an inapposite context. (See *Schmidt v. Foundation Health* (1995) 35 Cal.App.4th 1702, 1711 [addressing an interference of contract claim between an insurance broker and an insurance company]; *Newberger v. Rifkind* (1972) 28 Cal.App.3d 1070, 1073 [addressing whether an employee had earned stock options prior to termination in the context of an employment agreement].)

21

experience in family law represented each party at the settlement conference.[5]  Thus, it was reasonable for the court to infer that the parties were aware of the special meaning typically afforded to *Ostler & Smith* style support provisions.

In addition, the evidence indicates Tonya understood the term "bonus" to include only Donald's performance-based cash bonus, consistent with the specialized meaning of the term in the context of *Ostler & Smith* type provisions.  The parties agreed to a separate division of the stock options and Tonya's attorney specifically clarified that the agreement to the division of stock options included only those existing at the date of separation in January 2008, and specifically did not include the grant of options that Donald received as part of his relocation to Oregon.  Moreover, Tonya confirmed in the hearing with Judge Pollack that she understood the word "bonus" to refer to Donald's annual performance-based cash bonus at the time she entered into the agreement.  As Donald asserts, this is the definition the parties intended as well, Tonya's testimony appears to confirm that the mutual intent of the parties was to ascribe a specific meaning to the term "bonus" as including only Donald's annual performance-based cash bonuses.

Tonya suggests the court should not have considered evidence concerning the generally accepted understanding of the term "bonus" in the context of spousal support arrangements because neither the agreement nor the parties explicitly acknowledged the *Ostler & Smith* case.  However, as Tonya concedes, a court may consider whether the

---

[5]     The record indicates Tonya also filed a malpractice claim against the attorney that represented her at the settlement conference.  To the extent that Tonya's attorney did not provide her with adequate advice regarding the agreed upon support provisions, that is a matter more appropriate for the malpractice action.

parties used a particular term in a technical sense or whether the parties intended a special meaning for the term based on usage. (Civ. Code § 1644; *Windsor Pac. LLC v. Samwood Co., Inc.*, (2013) 213 Cal.App.4th 263, 274.) As discussed here, counsel familiar with spousal support agreements represented each party, and Tonya herself admitted she understood the term "bonus" to be limited, consistent with a specific rather than general usage. Thus, contrary to Tonya's assertion, competent evidence indicated the parties intended to use the term in a manner consistent with the specific meaning of the term in the context of other similarly structured spousal support agreements.

Tonya also asserts her testimony regarding her own subjective understanding of the term "bonus" at the time of the agreement was not competent extrinsic evidence. As discussed, however, Tonya's testimony was relevant to the mutual intent of the parties at the time they entered into the agreement. (See *Iberti*, *supra*, 55 Cal.App.4th at p. 1439.) Moreover, although the trial court indicated it would not give weight to either party's subjective understanding of the term, California law does focus primarily on the mutual intent of the parties, and the court did refer to Tonya's testimony regarding her intent at the time she entered into the MSA in its written decision. (See *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 38 [distinguishing rules of contractual interpretation in other states that rely solely on "certain magic words" contained in the agreement and stating, "[i]n this state, however, the intention of the parties as expressed in the contract is the source of contractual rights and duties"].) Thus, Tonya's testimony was competent and admissible evidence supporting the more limited definition of the term "bonus" that the trial court applied in this particular context.

23

We therefore conclude the court did not err when it determined that the term "bonus" in the MSA was reasonably susceptible to more than one meaning, and that substantial evidence supports the court's finding that the term "bonus" in the context of the MSA is limited to Donald's annual performance-based cash bonuses.[6]

## II. *Modification of Spousal Support*

We turn next to Tonya's assertion the trial court erred in modifying the spousal support award set forth in the MSA. Tonya argues the court erred in two ways: (1) concluding Donald's increase in bonuses was a substantial change in circumstances and placing a cap on the amount of bonus funds available for support; and (2) finding her physical disabilities did not preclude her from working.

### A. *Applicable Legal Principles*

In order to modify a spousal support order, the court must first find a material change of circumstances has occurred since the issuance of the previous order. (*In re Marriage of Khera & Sameer*, *supra*, 206 Cal.App.4th at p. 1475.) While a court may not reconsider circumstances that have not changed since the original support order, it may find that unrealized expectations—such as the failure of a party to become self-supporting despite reasonable efforts to do so—constitute a material change of circumstances. (*Id*. at p. 1476; *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 30.)

---

[6] Donald also asserts Judge Pollack previously determined the definition of the term "bonus" in a similar manner. It appears that Judge Pollack's previous ruling focused primarily on what was included in the arrearages set forth in the MSA but, in any event, we need not decide this issue as we conclude that Judge Oberholtzer properly construed the term in the written decision at issue in the present appeal.

24

In considering the modification of a spousal support order based on a change in circumstances, the trial court looks to the same factors set forth in section 4320 as it would consider in making a spousal support order in the first instance. (*In re Marriage of Khera & Sameer, supra*, 206 Cal.App.4th at p. 1475.) The first factor the court considers is "[t]he extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage." (§ 4320, subd. (a).) Earning capacity in this context means "the ability and the opportunity to earn income." (*In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1392.) A court determines a party's earning capacity by considering "the income the spouse is reasonably capable of earning based upon the spouse's age, health, education, marketable skills, employment history, and the availability of employment opportunities." (*In re Marriage of Simpson* (1992) 4 Cal.4th 225, 234.)

B. *Standard of Review*

An appellate court reviews trial court orders modifying spousal support for an abuse of discretion, and the trial court abuses that discretion when it modifies a support order without substantial evidence of a material change of circumstances. (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 398; *In re Marriage of West* (2007) 152 Cal.App.4th 240, 246 ["A spousal support order is modifiable only upon a material change of circumstances since the last order" and "[w]here there is no substantial evidence of a material change of circumstances, an order modifying a support order will be overturned for abuse of discretion."].) In addition, substantial evidence must also support any underlying factual findings regarding the factors the trial court considered

25

pursuant to section 4320, including but not limited to the earning capacity of the parties. (*In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 53.)

C. *Analysis*

1. *Substantial evidence supports the court's finding that there was a material change in circumstances*

Here, Tonya originally asserted her inability to work constituted a change of circumstance necessitating a modification to the spousal support arrangement. However, she then attempted to withdraw her request to modify spousal support and asserted there was no change of circumstances. The trial court disagreed and found there was a material change of circumstances insofar as Donald's bonuses had increased significantly to the point that they substantially eclipsed the amounts received during the marriage and caused Tonya's associated spousal support to exceed the marital standard of living. Accordingly, it modified the spousal support agreement by placing a cap of $250,000 on the amount of Donald's annual performance bonus available for support. Substantial evidence supports the court's findings in this regard and, as such, the court did not abuse its discretion in reconsidering the spousal support order. (See *In re Marriage of Dietz, supra*, 176 Cal.App.4th at p. 398.)

Donald testified that his annual income at the time of separation was approximately $300,000, and the MSA similarly indicated the spousal support was based upon Donald's monthly income of approximately $25,000 (or $300,000 per year). Thereafter, Donald relocated twice and received two significant promotions, both of which resulted in an increase in base pay as well as an increase in the maximum potential

26

amount of his annual performance bonus. Accordingly, the record indicates Donald paid Tonya approximately $170,000 in spousal support in 2009, the first year after the marriage; approximately $112,000 in 2010 due to the decrease in his bonus upon relocation to Oregon; and then increasingly higher amounts each year until 2014, in which Donald paid Tonya approximately $212,000 in support. Thus, the record supports the court's finding that Donald's promotions resulted in support to Tonya that exceeded the marital standard of living, and the court did not abuse its discretion by capping the amount of bonus income subject to the 35 percent spousal support award set forth in the MSA. (See *Kerr*, *supra*, 77 Cal.App.4th at p. 95 [suggesting a court may appropriately place a cap on the amount available for support from a given source].)

> 2. *Judge Pollack's 2012 order did not preclude imposition of a cap on the amount of Donald's bonus available for support*

Tonya asserts Judge Oberholtzer erred in imposing the cap because Judge Pollack had previously found that the MSA did not include such a cap, and that the issue was therefore subject to the doctrine of res judicata. However, Tonya misconstrues Judge Pollack's February 2012 decision.

Judge Pollack found that the stock options Donald received were not part of his bonus and were not included in the provision indicating Tonya was to receive 35 percent of any bonus. In reaching that conclusion, Judge Pollack also noted that the MSA did not run afoul to the court's decision in *Kerr*, *supra*, 77 Cal.App.4th at pages 93-95, "because the parties can agree to a spousal support figure that far exceeds the marital standard of living and the parties were not contemplating there would be any cap on spousal support"

27

at the time they entered the agreement. In *Kerr*, the appellate court found that a trial court abused its discretion by awarding a portion of revenues from stock options with no cap on the amount of stock option revenue available for support, because the value of the options could potentially increase at a rapid rate. (*Id*. at p. 95.) Judge Pollack was simply pointing out that, here, the parties had specifically negotiated an agreement in which there was no cap on the bonus amounts available for support, and that they were permitted to do so despite the ruling in *Kerr*.

When Judge Pollack made his comments, he was not evaluating an argument by Donald that spousal support should be reduced. Critically here, the MSA expressly permitted the trial court to maintain jurisdiction as to spousal support indefinitely, and to alter, modify or terminate the spousal support arrangement at any time, subject to either party making a proper showing. (§ 4336; *Iberti*, *supra*, 55 Cal.App.4th at p. 1441.) Thus, notwithstanding the terms of the MSA that the parties entered into in 2009—and Judge Pollack's previous statement that the MSA included no cap—the superior court had the authority to modify spousal support in 2016 based on a showing of materially changed circumstances. Therefore, principles of res judicata do not apply here, and the court did not err in determining it would be appropriate to impose a cap on the amount of bonus available for support based on the changed circumstances present in 2016. (See *Boeken v. Phillip Morris USA*, *Inc.* (2010) 48 Cal.4th 788, 797 [res judicata applies where a claim or issue raised in the present action is identical to a claim or issue raised in a previous litigation]; *cf. Olmstead v. Riley* (1955) 135 Cal.App.2d 117, 120-121 [finding

28

an issue of contract interpretation had previously been decided and that the doctrine of res judicata therefore precluded relitigation of the same issue].)

3. *Substantial evidence does not support the trial court's findings regarding Tonya's earning capacity*

Tonya also asserts that substantial evidence does not support certain findings made by the trial court regarding her ability to work. On this point, we agree.

Section 4320 requires that the trial court consider a variety of factors when determining the appropriate level of spousal support following a material change in circumstances. (*In re Marriage of Khera & Sameer*, *supra*, 206 Cal.App.4th at p. 1475.) A failure by the trial court to recognize and apply any applicable statutory factor in determining spousal support is reversible error. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304.)

Here, in addressing the earning capacity of the parties pursuant to section 4320, the trial court stated that "Tonya had a vocational evaluation . . . , which included recommendations for acquiring skills for employment, but she apparently has not followed up on any of them. (To be fair, that vocational evaluation did not suggest Tonya complete her degree.)" While it is true that the vocational evaluation did not recommend that Tonya complete her degree, the only recommendation it did make with regard to Tonya acquiring further skills was that she inquire with her employer at the time about courses within the financial industry that could benefit her with respect to her upward mobility in that company. Tonya had a limited ability to follow through on that

recommendation as she was laid off from the position within a few months of the evaluation. Thus, the court's finding is not entirely consistent with the record.

More importantly, the superior court's written decision goes on to state that "Tonya claims she is disabled and unable to work, but her treating orthopedic surgeon, Dr. Robert Gelb, did not seem to agree. He testified Tonya does have some limitations, but did not suggest that she cannot work full-time. For example, she has no limitations on using a key board." The transcripts of Dr. Gelb's testimony do not support the court's findings as stated.

Regarding the use of a keyboard, Dr. Gelb did not say Tonya had no limitations. Instead, he stated she could probably use one, but noted that she had small joint arthritis in her fingers and that the pain in her thumbs would be aggravated by the use of the space bar. He added that an occupational therapist would need to determine specifically to what extent and for how long she would be able to use a keyboard. He also explained that he had performed surgery on one of her hands and that she was planning to have the same surgery on her other hand, but that the recovery took several months. Moreover, even after the first surgery Tonya still had discomfort in that hand with certain activities. Finally, regarding Tonya's overall ability to work, Dr. Gelb concluded that the totality of her numerous ailments, many of which had been objectively verified by clinical findings, made her ability to perform any work *other than sedentary work that did not require any manipulation of her hands* extremely limited.

We recognize that the court was in the best position to make credibility determinations regarding the testimony of Dr. Gelb, Tonya and Donald, and that there

30

were other facts presented to the court regarding Tonya's previous work history and future ability to work. However, in determining that Tonya's earning capacity was substantially below where it should be, the court relied on factual findings regarding Dr. Gelb's conclusions that the record does not support. Therefore, we agree with Tonya that substantial evidence does not support the court's findings regarding her ability to work.

Although Tonya's earning capacity is just one of a number of factors the court considered before setting forth a modified spousal support order, the law required the court to consider each of the factors set forth in section 4320. (*In re Marriage of Khera & Sameer*, *supra*, 206 Cal.App.4th at p. 1475.) Thus, although we conclude the trial court did not error by capping the amount of Donald's annual performance bonus available for support, we must remand the matter for further consideration of the court's factual findings concerning Tonya's ability to work, and the impact of those findings on the overall support order. To the extent the trial court determines that Tonya's disability limits her ability to work 40 hours a week earning $16 per hour, as suggested in the MSA, the court should consider what impact, if any, that finding has on the adequacy of the fixed monthly support figure under the present spousal support arrangement.

### III. *Sanctions and Attorney's Fees*

Finally, we address Tonya's assertions that the court erred in awarding Donald sanctions and in refusing to award her additional needs-based attorney's fees.

31

A. *The Court Did Not Err When It Sanctioned Tonya*

As an initial matter, we note that the trial court made extensive findings regarding Tonya's overly litigious conduct, including an appendix containing a list of all of Tonya's motions over the past five years. Tonya does not dispute this list, or the court's associated findings. Instead, she challenges the court's order to the extent it allows Donald to withhold the sanctions from her percentage of future bonus payments. She also argues that the sanctions award imposed an unreasonable financial burden on her.

1. *Section 271 does not preclude an order allowing the supporting party to deduct sanctions from a variable component of the spousal support award*

We turn first to Tonya's contention that the order violated the statute. Section 271 subdivision (c), states, "[a]n award of attorney's fees and costs as a sanction pursuant to this section is payable only from the property or income of the party against whom the sanction is imposed." Tonya asserts that spousal support is not income and that this provision thus precluded the court from allowing Donald to withhold a portion of her spousal support to satisfy the sanctions award. We disagree.

Statutory interpretation is a question of law that we review de novo on appeal. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must

32

generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

When enacting section 271, the Legislature was primarily concerned with ensuring that the party sanctioned by the court would be the one responsible for paying the sanction. (See *In the Marriage of Daniels* (1993) 19 Cal.App.4th 1102, 1107-1111 [discussing the legislative history, including that one purpose of the statute was to make parties liable for conduct that frustrated public policy favoring settlement by imposing sanctions directly on the party].) However, because the statute also includes the phrase "from the property or income of the party," we must determine whether the Legislature intended to exclude spousal support from "income" as that term is used in the statute. (See *Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038-1039 ["It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage."].)

The Family Code does not specifically define "income" for purposes of section 271. But section 4061 does explain that for purposes of allocating additional child support obligations in proportion to the parents' net disposable income, "the gross income of the parent receiving the spousal support shall be increased by the amount of the spousal support received for as long as the spousal support order is in effect and is

33

paid."[7] (§ 4061, subd. (c).) Similarly, it is well settled that spousal support is includable in gross income for tax purposes. (See Hogoboom & King, Cal. Prac. Guide—Family Law (TRG 2017 rev. ed.) ¶ 10:504.) Thus, the standard income and expense declaration, form FL-150, that the court requires parties to file in connection with requests for orders to modify spousal support lists spousal support from either the marriage at issue or a different marriage as a form of reportable income. Not surprisingly then, courts have referred to spousal support as "income" in the context of sanctions awards. (See, e.g., *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161, 180 ["Wife also receives income from rental properties, part-time work, and spousal support."].) As there is no indication the Legislature intended to preclude the payment of sanctions from spousal support funds, we decline Tonya's request that we exclude spousal support from the meaning of the term "income" in section 271 subdivision (c).

Moreover, the cases Tonya relies on to support her contention are not applicable in this context. In *In re Marriage of Heiner* (2006) 136 Cal.App.4th 1514, the court concluded funds a party received in connection with the judgment in a separate lawsuit was not income *available for payment of child support* because it was for the specific purpose of reimbursing the losses of the party. (*Id.* at p. 1526.) The court did not address whether the funds were "income" more generally, or whether they would be available for sanctions. (*Ibid.*)

---

[7] Whether spousal support is "income" in a general sense, and whether it is income "available for child support" are two different things. Thus, section 4058 characterizes spousal support as income to the supported spouse, but excludes as not available for child support any spousal support being paid by another party to the proceeding.

34

In the other cases Tonya cites, the appellate courts concluded that the trial courts improperly denied an award of needs-based attorney's fees without considering the relative income and needs of the parties as required by section 4320, because a party should not have to use payments necessary for support to pay for their own attorney's fees. (See *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1315-1316; *In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1220.) Sanctions, however, are a different matter. Moreover, in section 271 the Legislature included a separate provision requiring the court to consider whether the sanction would impose an unreasonable financial burden. (§ 271, subd. (a) ["The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden."].) As suggested in *Marriage of Hatch*, *supra*, at p. 1221, even in the context of a financial need analysis pursuant to section 4320, there may be an exception where support is sufficient to allow the party to spend funds in addition to covering their basic needs. Thus, section 271 itself addresses the concern that a party should not use support necessary for their basic needs to pay sanctions through the separate financial burden requirement. We accordingly conclude the statute does not preclude the payment of a sanctions award from spousal support funds so long as the reduction in funds does not create an unreasonable financial burden.

35

## 2. *The sanctions award did not impose an unreasonable financial burden*

It remains to be determined whether the sanctions award imposed an unreasonable financial burden on Tonya. We review the sanctions awards pursuant to section 271 for an abuse of discretion. (See *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82.)

Here, Tonya reported her net worth in August 2009 to be over $1.5 million. Around the time of the award, Tonya reported somewhere between $266,000 and $400,000 in assets, was about to receive one-half of the 401(k) funds accumulated during the course of the marriage, and was receiving increasing annual support amounts that exceeded the support necessary to maintain her marital standard of living. Further, the court spread out the $50,000 sanction award specifically to minimize any associated burden, and permitted Donald to withhold the amounts from Tonya's percentage of his already variable annual bonus over the course of two years and only after Tonya had paid back other amounts that she owed.

Tonya contends the trial court made incorrect assumptions regarding her assets and debts. To the contrary, however, the court specifically found that Tonya signed income and expense declarations establishing these amounts under oath, and had no incentive to overestimate her net worth at the time she did so. Further, much of her substantial legal debt was incurred by aggressively pursuing largely unnecessary litigation in a manner that resulted in the very sanctions she now disputes.

Tonya also asserts the court failed to acknowledge that sanctions would result in support payments insufficient to cover her monthly expenses. But the purpose of spousal support is not to cover any and all expenses, and the court also specifically found that

36

Tonya had mismanaged her money and routinely overspent. (See § 4320; *In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 594; *In re Marriage of Shulze* (1997) 60 Cal.App.4th 519, 525.) Similarly, Tonya complains that her shortfall will only increase if Donald does not receive the maximum bonus in any given year. But it has always been possible that Donald's bonus would be significantly lower in any given year, as it was in 2009. Contrary to Tonya's assertions, the structure of the MSA that Tonya agreed to, which included a fixed monthly support payment of $7,500 as well as a variable amount based on a percentage of Donald's bonuses, indicates that a reduction in the amount of the already variable support that Tonya receives will not impose an unreasonable financial burden on her.

We therefore conclude that the trial court did not abuse its discretion by awarding $50,000 in sanctions against Tonya, payable by a reduction in the support due as a percentage of Donald's annual bonuses over the course of two years. (See also *In re Marriage of Falcone & Frye* (2012) 203 Cal.App.4th 964, 989 [interpreting an order that wife pay sanctions from her remaining portion of a fund split pursuant to a dissolution order as not limiting the source of sanctions, and affirming the order].)

B. *The Court Did Not Err When It Refused to Award Tonya Additional Needs-Based Fees*

Tonya also argues that the court erred in refusing to award her additional needs-based fees pursuant to section 2030. In dissolution and support proceedings, the court may order one party "to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the costs of maintaining or

37

defending the proceeding."  (§ 2030, subd. (a).)  The trial court should consider "the need

for the award to enable each party, to the extent practical, to have sufficient financial

resources to present the party's case adequately," and may consider a number of factors,

including the nature and complexity of the litigation, the efforts of the parties to resolve

as many areas of disagreement as possible without judicial intervention, and its own

experience in determining the reasonable value of the services rendered.  (§ 2032, subd.

(b); *In re Marriage of Jovel* (1996) 49 Cal.App.4th 575, 588 (*Jovel*).)  The court has

broad discretion in determining the amount of fees to award and, on appeal, we review

any such award for an abuse of that discretion.  (*Jovel*, *supra*, at p. 588.)

Here, the court had already awarded Tonya some fees in connection with the

present litigation, but declined to award her additional fees because it found that much of

the litigation had not been necessary.  It relied on many of the same findings it had made

in connection with the sanctions award and, as noted, attached an appendix listing the

various motions Tonya filed over the course of the previous six years.  Tonya responds

that the court erred in determining that much of the present litigation was not reasonably

necessary.  In particular, she claims the trial court specifically acknowledged that the

litigation regarding the QDROs was necessary because Donald had failed to include

certain accounts in the QDROs.  To the contrary, however, the court specifically found

that her continued litigation over the QDROs was frivolous, and noted that the issue

could have easily been resolved a long time ago and that Tonya "shared the blame" as she

failed to articulate her reason for objecting to the Elisor and instead accused Donald of

fraud.

38

Tonya also asserts that the litigation over her ability to work was necessary. But as the trial court noted, Tonya litigated this issue continuously over the years and the court had previously awarded needs-based fees in connection with the current requests for orders, as well as previous such requests. As the record supports the trial court's findings regarding Tonya's unnecessary and overly litigious conduct, we defer to the court's determination of the reasonable amount of attorney's fees necessary for the litigation. (*Jovel*, *supra*, 49 Cal.App.4th at p. 588.)

Tonya also contends the court failed to consider the factors enumerated in section 4320 in determining the amount of the award. However, the court did make detailed findings in a separate portion of the written decision regarding the section 4320 factors, and we presume the court applied those same findings when deciding the sanctions motion. Moreover, the court declined to award fees primarily because it found the fees Tonya requested were not reasonably necessary, such that the section 4320 factors were not particularly significant in this context.

We therefore conclude the trial court did not err when it refused to award additional needs-based attorney's fees to Tonya pursuant to section 2030.

## DISPOSITION

The order is reversed in part, and the matter is remanded to the superior court for further consideration of whether Tonya is able to work and what affect, if any, her inability to do so should have on the amount of spousal support, consistent with the analysis provided in this opinion.  In all other respects, the order is affirmed.  The parties shall bear their own costs on appeal.


DATO, J.

WE CONCUR:



McCONNELL, P. J.



BENKE, J.

40