Filed 4/3/23; certified for publication 4/28/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WEST PUEBLO PARTNERS, LLC,<br>    Plaintiff and Respondent,<br>v.<br>STONE BREWING CO., LLC,<br>    Defendant and Appellant. | A164022<br><br>(Napa County Super. Ct.<br> No. 21CV000498) |

After a commercial tenant did not pay rent for several months during the pandemic, its landlord sued for unlawful detainer. The tenant argued it was excused from paying rent because COVID-19 regulations and business interruptions triggered a *force majeure* provision found in its lease. The trial court disagreed and granted the landlord's motion for summary judgment. The trial court found that the *force majeure* provision only excused performance if the claiming party was unable to meet its obligations due to factors outside its control; but, because the tenant admitted during discovery it had the financial resources to pay rent during the period of the COVID-19 regulations but simply refused to do so, it could not invoke the *force majeure* provision.

1

We affirm the judgment. The trial court correctly interpreted the *force majeure* provision here not to apply where the tenant had *the ability* to meet its contractual obligations but chose not to perform due to financial constraints. The tenant's remaining arguments on appeal are unpersuasive.

## BACKGROUND

### I.

### *Facts*

The landlord, West Pueblo Partners, LLC (West Pueblo), is a four-member limited liability company that holds a single asset: the Borreo building (the building), located in downtown Napa. The tenant, Stone Brewing Co., LLC (Stone), is a large beer brewing and retail corporation that, among other things, operates restaurants known as "brewpubs."

Beginning in 2015, Stone began negotiating a lease (the lease) with West Pueblo to use the building for one of its new brewpubs. The lease was executed in May 2016, and provided that West Pueblo would deliver the building with certain improvements and that Stone would pay a base rent of $38,000 that would increase over the lease's 20-year term. The lease further provided that, absent special permission, "the Premises shall be used for a full service restaurant and brewery to include the sale of malt beverages for both on and off premise consumption events as well as the sale of [Stone's] merchandise . . . ."

Among the provisions the parties negotiated in the lease was a *force majeure* provision. That provision states as follows: "**FORCE MAJEURE**. If either Party is delayed, interrupted or prevented from performing any of its obligations under this Lease, and such delay, interruption or prevention is due to fire, act of God, governmental act or failure to act, labor dispute, unavailability of materials or any cause outside the reasonable control of that

2

Party, then the time for performance of the affected obligations of the Party shall be extended for a period equivalent to the period of such delay, interruption or prevention."

Stone took possession of the building in January 2018.[1]  When COVID-19 emerged in early 2020, California and local governments imposed severe restrictions on Napa restaurants and businesses.  From March 20, 2020, to May 18, 2020, Stone could not offer any on-premises dining.  From July 8, 2020, to September 2, 2020, it could not offer indoor dining.  From September 3, 2020, to October 19, 2020, it was required to limit indoor dining to 25 percent capacity.  That limitation was loosened to 50 percent from October 20, 2020, to November 15, 2020, but regulations were again tightened to prohibit indoor dining from November 17, 2020, to December 15, 2020.  From December 16, 2020, to January 24, 2021, Stone was banned from offering on-premises dining yet again.  Those restrictions were then loosened to prohibit only indoor dining from January 25, 2021, to March 2, 2021.

According to Stone, these restrictions were "devastat[ing]" to its operating profits.  As Stone explained in a letter that requested a rent reduction from West Pueblo:  "As a result of the forced closure, we were faced with the business decision to lay off vast majority of our team members in order to minimize the financial losses we started to experience on day 1 of the imposed closure.  With no known endpoint, we made the decision to continue to operate the business with a skeleton crew, not only as a service to the Napa community by offering donations to first responders and hospitals, but

---

[1] Stone's possession of the building was delayed in part because of delays in renovation occasioned by the 2018 Camp Fire affecting Northern California; Stone contends that these events are relevant to interpreting the *force majeure* provision and we discuss them in further detail below.

3

also with the hope that we could retain a certain number of the management team through these uncertain times."

During the first year of the pandemic in 2020, Stone argues that its monthly rent payments became unsustainable based on the negative impact COVID-19 regulations had upon its business generally. Stone initially asked West Pueblo for rent relief, and later withheld rent for June and July 2020, contending it was entitled to do so under the lease's *force majeure* provision. Stone paid full rent through November 2020, but again withheld rent for the months of December 2020, January 2021, February 2021, and March 2021 based on the *force majeure* provision. Stone's failure to pay rent for these four months—December 2020 through March 2021—gave rise to this litigation. West Pueblo ultimately issued a "Five-Day Notice to Pay Rent or Surrender Possession" on March 23, 2021. Stone did not pay, and West Pueblo filed an unlawful detainer action against Stone on April 6, 2021.

## II.

### *Motion for Summary Judgment*

The parties filed competing motions for summary judgment. West Pueblo's motion argued that Stone's *force majeure* defense fails as a matter of law because the undisputed facts showed that the COVID-19 government restrictions did not delay, interrupt, or prevent Stone from paying its rent. To the contrary, Stone conceded during litigation that it had the ability to pay rent for the building, and West Pueblo argued that a mere increase in expense or difficulty does not excuse a party's obligation to perform under the *force majeure* provision.

On October 20, 2021, the trial court granted West Pueblo's motion for summary judgment, denied Stone's motion for summary judgment, and

4

denied various motions filed by Stone concerning allegedly improper discovery conduct by West Pueblo.

In granting West Pueblo's motion, the trial court held that the *force majeure* provision was unambiguous: "In line with [West Pueblo's] position in the case, the court finds this plain language unambiguously means exactly what it says—that . . . the [*force majeure*] provision would apply to excuse Stone's obligation only if the pandemic delayed, interrupted or prevented Stone's payment of rent." Applying that interpretation of the lease, the court held that the *force majeure* provision "did not apply because Stone always maintained the ready *ability* to make the rental payments and simply made a financial decision not to" pay rent. (Italics added.)

The trial court concluded that there was no triable issue of material fact as to Stone's ability to pay rent based on certain admissions Stone made during discovery: "Stone[] repeated[ly] admi[tted] that it nevertheless had the financial resources to pay rent to [West Pueblo] from December 2020 to March 2021." In ruling against Stone, the trial court explained: "Stone's presentation of evidence reflecting that the [*force majeure*] events had a degree of negative financial impact on its business, where it admits it never lost the ability to pay rent, is simply insufficient to show a triable issue of fact as to delay, interruption or prevention of rent payments."

Stone timely appealed.

## DISCUSSION

### I.

### *Legal Standards*

Summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c,

5

subd. (c).)  A defendant seeking summary judgment "bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)  A defendant meets this burden by showing that plaintiff "has not established, and cannot reasonably expect to establish" an essential element of his claim. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

We review a grant of summary judgment de novo, which means we "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)  In deciding whether a material issue of fact exists for trial, we "consider all of the evidence set forth in the papers, except the evidence to which objections have been made and sustained by the court, and all inferences reasonably deducible from the evidence[.]" (Code Civ. Proc., § 437c, subd. (c).)

When interpreting a contract, a court seeks to ascertain the mutual intent of the parties solely from the written contract so long as possible. (Civ. Code, § 1638.)  The court considers the contract as a whole and interprets the language in context, rather than in isolation. (Civ. Code, § 1641.)  And where the language is clear and explicit, and does not involve an absurdity, the plain meaning governs. (Civ. Code, § 1638.)  In this same vein, the court "should avoid an interpretation which will make the contract unusual, extraordinary, harsh, unjust or inequitable [citations], or which would result in an absurdity . . . ." (*Harris v. Klure* (1962) 205 Cal.App.2d 574, 578.)

But, " 'Where the meaning of the words used in a contract is disputed, the trial court must provisionally receive any proffered extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a

6

particular meaning. [Citations.] Indeed, it is reversible error for a trial court to refuse to consider such extrinsic evidence on the basis of the trial court's own conclusion that the language of the contract appears to be clear and unambiguous on its face. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible. [Citations.]' " (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351 (*Wolf*), as modified on denial of rehg. Feb. 19, 2004.)

"The interpretation of a contract involves 'a two-step process: "First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]" [Citation.] The trial court's determination of whether an ambiguity exists is a question of law, subject to independent review on appeal. [Citation.]' " (*Wolf, supra*, 114 Cal.App.4th at p. 1351.)

## II.

### *There is No Triable Issue of Fact as to Whether the Force Majeure Provision Excused Stone's Rent Payments.*

Stone argues the trial court erred in concluding it did not create a triable issue of material fact as to whether it was excused from performing its obligation to pay rent for the December 2020 through March 2021 period at issue due an erroneous interpretation of the *force majeure* provision. In Stone's view, the COVID-19 pandemic and its associated government closures were *force majeure* events that excused or deferred its obligation to pay rent.

7

Stone offers three arguments in support of its position. First, Stone argues the ordinary definitions of "delayed," "interrupted," or "prevented" are not synonymous with "unable to pay," and that under its interpretation of these words, it was excused from performing under the lease because of the pandemic's impact on its business. Second, Stone argues that cases which have interpreted similar *force majeure* provisions have not imposed an "inability to pay" standard, but have found that a *force majeure* provision applied to delay the payment of rent where a *force majeure* event interfered with a party's operations or revenue. Third, Stone contends that extrinsic evidence demonstrates the parties understood the *force majeure* provision to encompass unforeseen events that make "performance [more] difficult and expensive than the parties originally contemplated." Stone points to the parties' course of dealing involving construction delays occasioned by the Camp Fire and to the negotiation history of the *force majeure* opinion. We are unpersuaded by these arguments.

A. *Plain Meaning of the Force Majeure Provision*

We begin our analysis with the language of the *force majeure* provision itself. This provision states in pertinent part: "If either Party is delayed, interrupted or prevented from performing any of its obligations under this lease, and such delay, interruption or prevention is due to [a *force majeure event*], then the time for performance of the affected obligations of the Party shall be extended for a period equivalent to the period of such delay, interruption or prevention."

As the trial court noted, "There is no dispute that the COVID-19 pandemic qualified as a [*force majeure*] event potentially implicating the [*force majeure*] provision of the lease." The only question then, is whether Stone's performance of its obligation to pay rent was "delayed, interrupted, or

8

prevented" by the COVID-19 pandemic and the related closure orders. During discovery, Stone admitted in responses to requests for admission that even though the brewpub operated at a loss, it was able to "and had the financial resources to pay rent to [West Pueblo]" for the months it withheld rent under the *force majeure* provision. Further, although the brewpub operated at a loss, Stone's requests for admission responses admitted that it generated an overall profit in January and February 2021.[2]

Stone argues however, that the terms "delayed, interrupted, or prevented" under the *force majeure* provision each have a distinct and ordinary meaning and cannot simply all mean "unable to pay" in a literal sense as the trial court held. For example, Stone points to the Oxford English Dictionary's definition of "delay" as "to hold back or slow down (a person or thing)" and "interrupt" as "to break the continuity of (something) in time." At the summary judgment hearing, the trial court agreed with Stone that "[d]elayed and interrupted don't mean unable, inability" and that "[t]hey have their own unique meaning that is not ambiguous." However, even applying that definition, the trial court determined that Stone was not delayed or interrupted in its ability to pay rent by its COVID-related financial difficulties. The trial court contrasted Stone's financial hardship with an interruption in the ability to make timely payment, such as a delay

---

[2] Stone's opening brief made no mention of these admissions. Its reply brief argued in a footnote that, prior to the subject motion, it amended its responses to deny that it made an overall profit in January or February 2021. Any argument that we cannot rely on Stone's prior admissions is waived as Stone failed to raise it in its opening brief. Even assuming it was not waived, Stone failed to seek leave to withdraw or amend its prior admissions pursuant to Code of Civil Procedure section 2033.300. These matters are thus deemed "conclusively established" against Stone. (Code Civ. Proc., § 2033.410, subd. (a).)

9

in receiving a line of credit or the post office's failure to deliver a mailed check on time. We agree with the trial court's reasoning. The plain meaning of the *force majeure* provision does not support an interpretation that ties a party's obligation to pay rent to its profitability or revenue stream instead of a delay or interruption caused by the *force majeure* event itself.

As our high court has held, where a contract contains a *force majeure* provision, the "mere increase in expense does not excuse the performance unless there exists 'extreme and unreasonable difficulty, expense, injury, or loss involved.' " (*Butler v. Nepple* (1960) 54 Cal.2d 589, 599.) This standard derives from the doctrines of impossibility and impracticability, which are common law defenses to contract performance. (See *Oosten v. Hay Haulers Dairy Employee & Helpers Union* (1955) 45 Cal.2d 784, 788.) Although a *force majeure* provision is often included in a contract to specify which qualifying events will trigger its application, the qualifying event must have still caused a party's timely performance under the contract to "become impossible or unreasonably expensive." (*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.* (C.D.Cal. 2001) 178 F.Supp.2d 1099, 1110, quoting *Oosten*, at p. 789.)

As applied here, Stone's ability to pay rent must have been "delayed, interrupted, or prevented" by COVID-19 because timely performance would have either been impossible or was made impracticable due to extreme and unreasonable difficulty. There is no triable issue of fact as to this issue because Stone admitted that it had the financial resources to pay rent to West Pueblo for the subject months, even though the brewpub (a small component of Stone's overall business) was operating at a loss. The mere fact that Stone was generating less revenue during this time period did not render its performance impossible or impracticable, and the *force majeure*

10

event therefore did not impair Stone's ability to pay its rent. Stone merely argues that the *force majeure* event made it more costly to do so.

Based on the plain meaning of the *force majeure* provision and the undisputed material facts in this case, the COVID-19 and the related closure orders did not delay, interrupt, or prevent Stone's timely performance under the lease.

B. *Case Authorities Do Not Favor Stone's Interpretation of the Force Majeure Provision.*

We now turn to Stone's next argument, that caselaw favors its interpretation of the *force majeure* provision. We preliminarily observe that these cases are out-of-state decisions and supply persuasive authority only to the extent we find their reasoning convincing. (See *LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 371.)

Stone primarily relies upon *In re Hitz Restaurant Group* (Bankr. N.D. Ill. 2020) 616 B.R. 374 (*Hitz*), which it characterizes as the "most analogous case" with the facts there "[being] nearly identical." In that case, as a result of COVID-19 business closure orders made in Illinois, the tenant, Hitz, argued that "rent is excused by the lease's force majeure clause," which provided relief if a triggering event "prevented or delayed, retarded or hindered" Hitz from performing an obligation. (*Id.* at pp. 376–377.) The court concluded that the pandemic could be said to have caused the post-bankruptcy petition (ongoing) failure to pay—at least in part—because, even had the restaurant re-opened, government restrictions would have prevented it from generating sufficient business to cover its rent obligation. (*Id.* at pp. 377–378 ["the [government] order was unquestionably the proximate cause of Debtor's inability to pay rent, at least in part, because it prevented Debtor from operating normally and restricted its business to take-out, curbside pick-up, and delivery"].)

11

We find *Hitz* distinguishable on its facts. *Hitz* involved a special purpose entity that ran a single restaurant that had already been placed into bankruptcy at the time of the litigation. (*Hitz, supra*, 616 B.R. at p. 376.) There was thus no dispute as to the "Debtor's *inability* to pay rent," which the court acknowledged. (*Id*. at p. 377, italics added.) Because the ability to pay rent was not disputed, the decision itself includes few facts, but a review of the docket[3] illustrates the circumstances of the debtor precluded it from paying rent altogether: the entirety of the debtor's assets consisted of $6,000 in inventory at the restaurant, and $100 in cash; the debtor could not operate the restaurant and already owed over $60,000 in rent. Here, Stone is a large beer brewing and retail corporation with multiple operations, and more importantly, admitted that it maintained the ability to pay rent during the disputed months.[4]

The other cases Stone relies on are similar; each involves a trial court's factual finding that a tenant was rendered unable to pay rent by the COVID-19 pandemic and thus was excused from timely payment by a lease's *force majeure* clause. (*Morgan Street Partners, LLC v. Chicago Climbing Gym Co. LLC*, (N.D.Ill. Mar. 1, 2022) No. 20-CV-4468, 2022 WL 602893; *1600 Walnut Corp. v. Cole Haan Co. Store* (E.D.Pa. 2021) 530 F.Supp.3d 555.) These cases turn not on the contested interpretation of a *force majeure* clause but rather on the particular facts presented by each case. In *Morgan Street Partners*, the court found that the tenants had "offered uncontroverted evidence that

---

[3] We grant West Pueblo's unopposed request to judicially notice the docket of *Hitz* pursuant to Evidence Code section 452, subdivision (d)(2).

[4] We also observe but do not rely upon the fact that the holding of *Hitz* has also been questioned as an "outlier" decision. (See *55 Oak Street LLC v. RDR Enterprises, Inc.* (Me. 2022) 275 A.3d 316, 324, fn. 9 ["The approach taken in *Hitz* is an outlier and has not been followed elsewhere"].)

the pandemic—and the government orders—[were] the *sole* reason they could not pay rent to Plaintiff." (*Morgan Street Partners*, at p. *5, italics added.) And in *1600 Walnut Corp.*, the court found that the government's "COVID-19 orders closing and restricting retail businesses are the most obvious proximate cause of [the tenant's] non-performance." (*Id.* at pp. 558–559.) Here, by contrast, Stone made binding admissions that despite pandemic orders it had the ability to pay rent during the subject period. Thus, the "cause" of its nonpayment was not its inability to pay rent timely but its decision not to make payment.

A recent California case is more persuasive. In *SVAP III Poway Crossings, LLC v. Fitness International, LLC* (2023) 87 Cal.App.5th 882, a fitness center was unable to operate intermittently due to COVID-19 closure orders. (*Id.* at p. 886.) In opposition to summary judgment in the landlord's breach of contract action, the fitness center argued that the *force majeure* provision in the lease temporarily excused its obligation to pay rent. (*Id.* at p. 888.) The Fourth District Court of Appeal affirmed the trial court's grant of summary judgment to the landlord. (*Ibid.*) Although the *force majeure* provision in that case included an exclusion for any "failures to perform . . . which can be cured by the payment of money," the Fourth District independently held that there was also no evidence "that the pandemic and resulting government orders hindered Fitness's ability to pay rent." (*Id.* at pp. 892–893.) With respect to impossibility and impracticability, the court similarly held that, "Nothing about the pandemic or resulting closure orders has made Fitness's performance of its obligations to SVAP—paying rent— impossible." (*Id.* at p. 893.) Indeed, "Governmental acts that merely make performance unprofitable or more difficult or expensive do not suffice to excuse a contractual obligation." (*Id.* at p. 895.) We agree.

C. *Since the Force Majeure Provision is Unambiguous, We Need Not Consider Extrinsic Evidence to Aid Interpretation.*

As *Wolf* sets out, a court in interpreting a contract provisionally receives credible extrinsic evidence concerning the parties' intentions to determine whether the contract language is reasonably susceptible to a party's interpretation. (*Wolf, supra*, 114 Cal.App.4th at p. 1351.) Stone proffers extrinsic evidence in support of its interpretation of the lease's *force majeure* provision. This evidence does not alter our conclusion that the provision is unambiguous and is not reasonably susceptible to Stone's interpretation.

For instance, with respect to Stone's evidence about the parties' course of dealing surrounding the Camp Fire, we conclude that this extrinsic evidence sheds little light on the application of the *force majeure* clause to the parties' rent dispute.[5] To elaborate, West Pueblo was obliged by the lease to complete certain renovations and deliver the building to Stone by a specified date; if delivery was delayed; Stone's rent would be abated two days for each day of delay. At the time of the Camp Fire, Stone summarizes, West Pueblo's "construction team was preparing [the building] for Stone's approaching tenancy. But the Camp Fire had created smoky air . . . while [West Pueblo] and its workers were free to continue working—the government had not prohibited outdoor work—the air quality made that work more difficult." Stone states that it did not hold West Pueblo accountable for delays in construction during this time because it recognized the Camp Fire as a *force majeure* event that "delayed, interrupted, or prevented" construction work.

---

[5] Various portions of the parties' briefs, including their discussion of how the *force majeure* provision applied to the Camp Fire, are sealed. As a result, although we have considered the specific facts detailed in the briefs, we discuss them only generally in this opinion.

Stone argues that the parties agreed to postpone West Pueblo's obligations there "even though there was no evidence that [West Pueblo] was, in fact, unable to perform."

First, we note that although Stone argues that the parties had agreed to apply the *force majeure* provision to the delay in construction caused by the Camp Fire, West Pueblo disputes that it in fact discussed the applicability of the *force majeure* provision to the Camp Fire with Stone in any detail at that time. To what extent the parties *agreed* to apply the *force majeure* provision to that event remains questionable.

In any event, as the trial court stated, it is undisputed that the words "delayed" and "interrupted" do not mean "unable to," and so the issue is not whether West Pueblo would have been able to continue construction if it was determined to do so. Along these lines, Stone argues that "[h]ad it offered its construction workers $1,000 per hour, there is little doubt [West Pueblo] could have enticed them to complete the job on time." This reasoning would obviate the doctrine of impracticality, as any performance obligation short of an impossible one could be satisfied at sufficient expense. This is not the standard; rather, the Camp Fire created *impracticable* construction conditions because it made the continuation of such work unreasonably difficult and hazardous for the workers. By contrast, as discussed above, the COVID-19 closure orders did not directly cause a delay or interruption in Stone's ability to pay rent; rather, Stone admitted it had the ability to pay rent at all relevant times, and indeed its business made a profit during two of the disputed months. Stone's ability to pay rent was therefore not made impracticable and is not comparable to the impracticability of continuing construction work during the hazardous Camp Fire.

15

In sum, Stone has failed to raise a triable issue of fact that it was delayed, interrupted, or prevented from paying rent due to COVID-19 and the related closure orders.

## DISPOSITION

The judgment is affirmed. West Pueblo shall recover its costs on appeal.

_____
Van Aken, J.*

We concur:


_____
Stewart, P.J.


_____
Miller, J.

*West Pueblo Partners, LLC v. Stone Brewing Co., LLC* (A164022)


      * Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17

Filed 4/28/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WEST PUEBLO PARTNERS, LLC,<br>     Plaintiff and Respondent,<br>v.<br>STONE BREWING CO., LLC,<br>     Defendant and Appellant. | A164022<br><br>(Napa County Super. Ct.<br> No. 21CV000498)<br><br>**ORDER CERTIFYING<br>OPINION FOR PUBLICATION** |

The opinion in the above-entitled matter, filed on April 3, 2023, was not certified for publication. For good cause, request for publication is granted.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.


Dated: _____            _____

                                  Stewart, P.J.

1

Trial Court:                                          Napa County Superior Court

Trial Judge:                                          Hon. Victoria D. Wood

Attorneys for Defendant and Appellant:    BraunHagey & Borden
Stone Brewing Co., LLC                         Matthew Borden
                                                      Kory J. DeClark


Attorneys for Plaintiff and Respondent:   Munger, Tolles & Olson
West Pueblo Partners, LLC                     Jacob M. Rosen
                                                      Ted G. Dane
                                                      Garth T. Vincent
                                                      Stephen A. Hylas